THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ELAINE LYNCH, Defendant-Appellant.

First District (5th Division)    No. 79-400

Opinion filed April 11, 1980.

John J. Jiganti and Theodore A. Sinars, both of Harris, Burman, Sinars and Jiganti, of Chicago, for appellant.

William J. Scott, Attorney General, of Chicago (James E. Sternik and Thomas S. Malciauskas, Assistant Attorneys General, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant appeals from an order finding her in contempt of court for refusing to comply with an order to produce certain partnership records pursuant to a grand jury subpoena. The issue before this court concerns the availability, under *Bellis v. United States* (1974), 417 U.S. 85, 40 L. Ed. 2d 678, 94 S. Ct. 2179, of the State and Federal constitutional privileges against self-incrimination to partners in family partnerships who are ordered to produce partnership records. We affirm the trial court

and hold that *Bellis* does not create a mandatory exception to the "organized institutional activity" rule and that the availability of the privilege where family partnerships are involved must be decided on a case-by-case basis.

The pertinent facts are not in dispute. Defendant was found in contempt of court for failure to produce certain records of a partnership of which she and her father are the sole partners. Asserting her privilege against self-incrimination under both the United States and Illinois constitutions, defendant refused to produce the records, which had been subpoenaed by the Cook County grand jury. The State filed a petition to compel production, which was granted by the trial court. Upon defendant's refusal to comply with the order, she was found in contempt and was remanded to the custody of the sheriff until such time as she produced the records. The enforcement of the order was stayed pending this appeal.

Defendant is one of two partners in the McVittie Plating Company (McVittie), an Illinois general partnership. The other partner, George Lindquist, is defendant's father, who is apparently inactive in the business. Lindquist and his wife had originally purchased the company from James McVittie in 1947. Defendant succeeded her mother as a partner after Mrs. Lindquist's death.

According to the State's petition and its supplement, the day-to-day operations of the company are directed by Joseph Gergits, McVittie's general manager. The company employs 55 people in four separate divisions. There is a checking account in the partnership name and either of the two partners may withdraw funds upon his or her signature alone. There is also a payroll account, from which another person, Judith Mitchell, is authorized to withdraw funds on her signature only. The company has its own stationery in the partnership name and tax returns are also filed by the partnership itself.

McVittie was the target of a regular grand jury investigation in September 1978 pertaining to possible violations of the Illinois Antitrust Act. (Ill. Rev. Stat. 1977, ch. 38, par. 60—3.) The company was served with a *subpoena duces tecum* which ordered it to produce various records relevant to its operations and finances. Defendant appeared before the grand jury and refused to produce the documents, invoking the privilege against self-incrimination under the fifth amendment of the United States Constitution and article I, section 10 of the Illinois Constitution of 1970.

The State filed its petition to compel defendant to produce the materials. The October grand jury issued an identical subpoena, and, at the hearing on the State's petition in November, defendant was served with an identical subpoena from the November grand jury. The parties

stipulated before the court that defendant's response to the October and November subpoenas would be the same as her response to the first subpoena, which was issued in September. Briefs having been submitted by both parties, the trial court conducted a hearing on November 14, 1978, and found defendant in contempt. The order remanding defendant to the custody of the sheriff until she produced the documents was stayed pending the disposition of her appeal.

OPINION

I.

Defendant first contends that individuals are protected by the fifth amendment to the United States Constitution from the compulsory production of the books and records of a small, family partnership. Relying on *Boyd v. United States* (1886), 116 U.S. 616, 29 L. Ed. 746, 6 S. Ct. 524; *United States v. White* (1944), 322 U.S. 694, 88 L. Ed. 1542, 64 S. Ct. 1248; and *Bellis v. United States* (1974), 417 U.S. 85, 40 L. Ed. 2d 678, 94 S. Ct. 2179, she maintains that, while generally the production of documents and records of a partnership or other organizational entity cannot be prevented by invoking the privilege against self-incrimination the Supreme Court has carved out a "family partnership exception" through its acceptance of the holding in *United States v. Slutsky* (S.D.N.Y. 1972), 352 F. Supp. 1105. However, an analysis of these cases and the development of the privilege discloses no such absolute rule.

In *Boyd*, the Supreme Court considered the availability of the privilege against self-incrimination through the production of partnership records. An action had been brought against the partners of E. A. Boyd & Sons, seeking the forfeiture of certain property for alleged fraud against the revenue laws. Acting pursuant to existing Federal statutes, the trial court ordered that the partners be served with notice to produce invoices for the property involved. The documents were produced, the partners noting their objections, and the objections were renewed when the documents were offered into evidence. The Supreme Court held that the law under which defendants were ordered to produce the invoices was repugnant to both the fourth amendment privacy right and the fifth amendment privilege against self-incrimination because it provided that failure to produce documents as ordered constituted a confession of the allegations. Therefore, the court stated, the lower court's order to produce the invoices was an attempt "to extort from the party his private books and papers to make him liable for a penalty or to forfeit his property." 116 U.S. 616, 624, 29 L. Ed. 746, 749, 6 S. Ct. 524, 529.

Although *Boyd* involved the disclosure of partnership records, the Supreme Court has since noted that *Boyd* was not based on partnership considerations, having been decided in the early stages of the

development of the fifth amendment privilege. At that time the significance of the partnership status was not yet recognized and the documents were considered private papers. *Bellis v. United States* (1974), 417 U.S. 85, 95 n.2, 40 L. Ed. 2d 678, 687-88 n.2, 92 S. Ct. 2179, 2186 n.2.

The "organized, institutional activity" concept was delineated in *United States v. White* (1944), 322 U.S. 694, 88 L. Ed. 1542, 64 S. Ct. 1248, when the court held that neither the fourth nor the fifth amendment requires the recognition of the privilege against self-incrimination so as to prevent production of documents of a group by a representative of that group. The privilege had been invoked by an assistant supervisor of the local organization of an international union when he appeared before a grand jury but refused to produce documents in accordance with a subpoena directed to the local. The court concluded that the privilege was not available to either the union or the supervisor based on the nature of the union organization and the fact that the documents were not the supervisor's private papers but were, instead, held by him in a representative capacity.

The court in *White* considered the union to be similar to a corporation in many ways, finding it to be an "organized, institutional activity" rather than a "wholly individual activity." (322 U.S. 694, 701, 88 L. Ed. 1542, 1547, 64 S. Ct. 1248, 1252.) The union's existence was perpetual in fact, if not in law, and it operated under its own constitution, bylaws and rules, with its officers having limited authority. The union had a separate treasury, owned separate real and personal property and could be sued in the union's name. Furthermore, its varied business and operations were not the private undertakings of the members and its books and records were separate and distinct from the records of the individuals. The test, the court stated, was:

> "* * * whether one can fairly say under all the circumstances that a particular type of organization has a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only." 322 U.S. 694, 701, 88 L. Ed. 1542, 1547, 64 S. Ct. 1248, 1252.

The *White* rule was more clearly defined in *Bellis v. United States* (1974), 417 U.S. 85, 40 L. Ed. 2d 678, 94 S. Ct. 2179, in which a former member of a three-partner law firm refused to produce partnership records in his possession pursuant to a grand jury subpoena. The *Bellis* court concluded that the *White* rule could not be reduced to a simple proposition based only on size and that it was not particularly helpful where the interests were not clearly either personal or group interests but

were rather a combination of the two. In applying the *White* rule to the small partnership there involved, the court in *Bellis* considered various factors in determining the nature of the partnership. It observed that the partnership had its own identity independent of the individual partners, having a bank account and stationery in the partnership name, filing separate partnership tax returns, and holding itself out to third parties as a separate entity. The State partnership law had imposed certain organizational requirements, and the firm could be sued and could hold title to property. Furthermore, the court did not find the firm to be an informal or temporary organization that undertook only a few short-lived projects, as evidenced by the firm's 15-year existence prior to its dissolution. Finally, the firm had employed six persons besides the partners, including two attorneys who practiced law on behalf of the firm.

The court noted the ownership interest in the partnership papers but found that interest to be derivative of the partnership status and pointed out that the papers could not be used for other than partnership purposes without the permission of the other partners. Consequently, the court found that the papers were held in a representative capacity and the privilege was therefore not available.

However, the court did state that: "This might be a different case if it involved a small family partnership" and cited *United States v. Slutsky* (S.D.N.Y. 1972), 352 F. Supp. 1105, and *In re Subpoena Duces Tecum* (N.D. Cal. 1948), 81 F. Supp. 418, 421. (417 U.S. 85, 101, 40 L. Ed. 2d 678, 691, 94 S. Ct. 2179, 2189.) The court did not elaborate on its comment and merely restated its conclusion that under the circumstances before it the personal privilege against compulsory self-incrimination was inapplicable. We cannot conclude from this passing reference to *Slutsky* that the court intended the statement of a rule creating a family partnership exception. Such a conclusion would be contrary to the Supreme Court's longstanding policy against anticipating a question of constitutional law before it is necessary to decide it or formulating a rule of constitutional law that is broader than the rule required by the factual situation before the court. *Liverpool, New York & Philadelphia Steamship Co. v. Commissioners of Emigration* (1885), 113 U.S. 33, 39, 28 L. Ed. 899, 901, 5 S. Ct. 352, 355.

■■ Furthermore, the court's language in both *Bellis* and *White* demonstrates that the two cases were decided solely on the basis of the facts there presented rather than on a projected factual setting. (*Bellis*, 417 U.S. 85, 101, 40 L. Ed. 2d 678, 691, 94 S. Ct. 2179, 2189; *White*, 322 U.S. 694, 88 L. Ed. 1542, 1547, 64 S. Ct. 1248, 1252.) It has been stated that *Bellis* requires a case-by-case analysis (*In re Witness Before the Grand Jury* (9th Cir. 1976), 546 F. 2d 825, 827), and the cases which have considered the availability of the privilege where a small or family

partnership is involved have reflected such an analysis rather than the application of an inflexible rule. (See, *e.g., United States v. Kuta* (7th Cir. 1975), 518 F. 2d 947; *United States v. Greenleaf* (5th Cir. 1977), 546 F. 2d 123; *In re September, 1975, Special Grand Jury* (N.D. Ind. 1977), 435 F. Supp. 538.) Even the court in *Slutsky* observed that the determination of the availability of fifth amendment protection is "essentially factual." (352 F. Supp. 1105, 1107.) We therefore hold that, under *Bellis*, the availability of the privilege against self-incrimination to avoid the compulsory production of the books and records of a small, family partnership must be determined on a case-by-case basis.

Applying the rules of *White* and *Bellis* to the facts before us, we find that McVittie has a separate organizational identity apart from its two partners. As in *Bellis*, business is conducted under the McVittie name, with stationery and bank accounts in the partnership name and tax returns that are filed by the partnership itself. Rather than being a temporary association, McVittie has been in existence for over 30 years, as different partnerships. Defendant and her father succeed the partnership formed by both of defendant's parents, who had purchased McVittie from its founder. Notwithstanding the changes in ownership, McVittie has continued its original business under its original name. Although defendant contends that she is personally involved in the operations of McVittie, there is also a general manager who is in charge of day-to-day matters and another person is authorized to issue paychecks.

The instant partnership is unlike the partnership in *Slutsky*. There, the partnership, which operated a large resort, consisted of two brothers. The resort had originally been opened and operated by the father of the two brothers in the early 1900's. Although the partnership in *Slutsky* had an extensive payroll and had real estate, buildings and gross receipts valued at several million dollars, only the two partners and their sons were authorized to draw checks on the partnership. Furthermore, the two partners and their sons lived on the resort premises and personally managed the resort on a full-time basis. The partnership employed only one full-time bookkeeper and one full-time accountant, whose records belonged to the partnership, and whose work was familiar to the two partners and their sons. The court in *Slutsky* found the partnership to be a "personal family business" rather than "an impersonal and detached business owned by absentees." 352 F. Supp. 1105, 1108.

Unlike *Slutsky*, the instant case involves an existing business which became a family concern only after it was acquired by defendant's parents. The actual daily management of the business is in the hands of a general manager who is not a partner. Apparently, neither the general manager nor the person authorized to issue payroll checks is related to the partners.

■ Moreover, we disagree with defendant's assertion that the lack of active involvement by her father makes the partnership more akin to a sole proprietorship. By virtue of the Uniform Partnership Act (Ill. Rev. Stat. 1977, ch. 106½, pars. 1 through 43), both defendant and her father have the power to bind the partnership and the right to access to and inspection of partnership books and records. They also share joint liability for the debts and obligations of the partnership. That Mr. Lindquist does not assert his rights as a partner does not affect his legal status as a partner, with its attendant rights and responsibilities. On the contrary, we believe that Mr. Lindquist's inactivity demonstrates that the partnership interests here are not so inextricably intertwined with personal and family interests that the partnership is an extension of the family relationship, as was the case in *Slutsky*. Consequently, we conclude that McVittie is an "organized, institutional activity" and that defendant therefore holds the partnership papers in a representative capacity. Accordingly, the fifth amendment privilege against self-incrimination is not available to defendant to prevent production of the subpoenaed records.

## II.

Defendant next contends that the privilege against self-incrimination under article I, section 10 of the Illinois Constitution of 1970 protects her from the compulsory production of the partnership records, regardless of the lack of availability of the Federal privilege. The parties agree that the Federal standard is the minimal one and that the several States may expand an individual's rights beyond those existing under the Federal law. Relying on *Lamson v. Boyden* (1896), 160 Ill. 613, 43 N.E. 781, and the slight difference in phrasing between the Federal and State provisions, defendant maintains that the privilege against self-incrimination under the Illinois Constitution extends to documents as well as testimony. The State, on the other hand, contends that the Federal interpretation of the privilege against self-incrimination has been adopted in this State and that defendant here is therefore not protected by the Illinois Constitution. We agree.

Preliminarily, we note that this aspect of the case presents a question of first impression involving the interpretation of article I, section 10 of the Illinois Constitution of 1970 in the light of *Bellis v. United States* (1974), 417 U.S. 85, 40 L. Ed. 2d 678, 94 S. Ct. 2179.

In *People v. Jackson* (1961), 22 Ill. 2d 382, 176 N.E.2d 803, *cert. denied* (1962), 368 U.S. 985, 7 L. Ed. 2d 523, 82 S. Ct. 600, a case which involved the use of hearsay evidence to establish probable cause for a search warrant, our supreme court stated:

"We have indicated before that we will follow the decisions of the United States Supreme Court on identical State and Federal

constitutional problems." (22 Ill. 2d 382, 387, 176 N.E.2d 803, 805.) Under the fifth amendment to the United States Constitution, a person cannot be "compelled in any criminal case to be a witness against himself," while article I, section 10 of the Illinois Constitution of 1970 provides that a person shall not be "compelled in a criminal case to give evidence against himself." Despite the differences in language, the Illinois courts have consistently considered the Illinois and Federal privileges against self-incrimination simultaneously. Such was the case in *People ex rel. Hanrahan v. Power* (1973), 54 Ill. 2d 154, 295 N.E.2d 472, in which our supreme court applied the Federal standard to both the State and Federal privileges and stated that the provisions "differ in semantics rather than in substance and have received the same general construction." 54 Ill. 2d 154, 160, 295 N.E.2d 472, 475.

Cases arising under the privilege found in the 1870 Constitution (Ill. Const. 1870, art. II. §10) have been decided on the basis of the then-existing Federal standard and thus indicate that Illinois law has developed to keep pace with the Federal law. In *People v. Monroe* (1963), 27 Ill. 2d 449, 189 N.E.2d 350, the defendant invoked the privilege against self-incrimination when asked to explain orally certain entries in corporate books which she had produced pursuant to a grand jury subpoena. The court held that the privilege protected the corporate representative from answering questions, but not from producing the records. The Federal and State privileges were again considered simultaneously in *People ex rel. Scott v. Pintozzi* (1971), 50 Ill. 2d 115, 277 N.E.2d 844, when the court cited *White* and applied the Federal rule in holding that the privilege against self-incrimination is personal and cannot be invoked by or on behalf of a corporation to prevent the production of corporate records. In the Constitution of 1970, the privilege against self-incrimination was retained, intact, in article I, section 10, and the scope of the privilege has continued to be defined by the Federal standard. See *People ex rel. Hanrahan v. Power.*

Defendant's reliance on *Lamson v. Boyden* (1896), 160 Ill. 613, 43 N.E. 781, is misplaced. In *Lamson*, the court stated:

> "Whenever a witness is excused from giving testimony upon the ground, that his answers will tend to criminate him, or subject him to fines, penalties or forfeitures, he cannot be compelled to produce books or papers which will have the same effect." (160 Ill. 613, 618, 43 N.E. 781, 782.)

The court therefore held that the compulsory production of partnership records was barred by the privilege against self-incrimination when the production of the records would have produced the same result as the witness' testimony. Nevertheless, we disagree with defendant's contention that *Lamson* controls in the instant case. *Lamson* was decided 10

years after *Boyd v. United States* (1886), 116 U.S. 616, 29 L. Ed. 746, 6 S. Ct. 524, and reflects a similar lack of consideration of the significance of the partnership entity. Although *Lamson* has never been overruled, its holding has been eroded by later cases, such as those cited above, which indicate that the development of the privilege under the Illinois Constitution has followed the development of the Federal privilege in order to meet, but not exceed, the Federal privilege.

■ Accordingly, we conclude that the Federal and State privileges are identical. There being no protection by the Federal privilege under the rule of *Bellis*, we hold that defendant cannot avail herself of the privilege under the Illinois Constitution.

For the foregoing reasons, the order of the circuit court of Cook County finding defendant in contempt is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.