ELIZABETH CARTER, Independent Adm'r of the Estate of Paul Carter, Deceased, Plaintiff-Appellee, v. ABDOL AZARAN, Defendant-Appellant.

First District (1st Division)    No. 1—01—0736

Opinion filed July 22, 2002.

950

Hugh C. Griffin and Stevie A. Starnes, both of Lord, Bissell & Brook, of Chicago, for appellant.

Donald A. Shapiro, of Donald A. Shapiro, Ltd., of Chicago, for appellee.

PRESIDING JUSTICE COHEN delivered the opinion of the court:

Plaintiff Elizabeth Carter, independent administrator of the estate of her deceased husband, Paul Carter (Paul), sued defendant Dr. Abdol Azaran for medical negligence arising out of defendant's treatment of Paul. Following trial, a jury awarded plaintiff $385,000 for aggravation of Paul's preexisting conditions, $1,060,000 for pain and suffering, and $55,172 for medical expenses. Defendant was granted a setoff of $125,000 in recognition of plaintiff's prior settlement with the nursing home where defendant was employed. After awarding plaintiff certain costs and granting defendant a remittitur of $1,063 for certain medical expenses, the trial court entered judgment in favor of plaintiff for $1,375,172.

On appeal, defendant first argues that the trial court erred in limiting the cross-examination of three witnesses. Defendant further argues that he is entitled to judgment notwithstanding the verdict or a new trial because the jury's award for pain and suffering was improperly based on speculation and was not supported by the evidence. Finally, defendant argues that he is entitled to a substantial remittitur because the award for pain and suffering was excessive and because Paul would have incurred certain medical expenses regardless of defendant's negligence. For the following reasons, we affirm.

## BACKGROUND

Plaintiff filed suit as independent administrator of her late husband Paul's estate against defendant and The Imperial of Hazelcrest nursing facility (Imperial) alleging medical negligence for failure to properly treat Paul's diabetes. Plaintiff voluntarily dismissed Imperial with prejudice following a $125,000 settlement and then proceeded to trial against defendant.

At trial, plaintiff testified that she had known Paul for approximately 44 years and that Paul had been diabetic "[e]ver since right after [plaintiff] met him." According to plaintiff, Paul had required daily injections of insulin since late 1988. Paul began to develop symptoms of Alzheimer's disease in 1992 and in February 1994 was admitted to Glenwood Nursing Home. Following a fall in December 1994 at Glenwood, Paul was admitted to St. James Hospital. Doctors there determined that Paul had suffered a stroke and diagnosed him with spinal canal stenosis, pneumonia, fever, a urinary tract infection and dehydration. During his St. James admission, Paul became bedridden and developed a decubitus ulcer (bedsore) on his lower back.

Following Paul's discharge from St. James on January 13, 1995, plaintiff had Paul admitted to Imperial because she believed Imperial offered better care for bedridden patients. Paul was placed under the care of defendant Dr. Azaran, Imperial's medical director. Plaintiff informed defendant that Paul was diabetic and required daily insulin. At this time, defendant continued an order entered by the attending physician at St. James directing that Paul be given a daily dose of Humulin N, a long-acting form of insulin.

On January 19, 1995, defendant transferred Paul to Ingalls Memorial Hospital for treatment of a urinary tract infection. Based upon Paul's condition while at Ingalls, defendant continued the order for Humulin N, ordered blood glucose monitoring four times a day, and directed that Paul be given varying doses of Humulin R, a fast-acting form of insulin, should his blood glucose exceed specified levels. Because Paul was eating less at the time, defendant discontinued the order for Humulin N on January 26, 1995.

Paul was released from Ingalls and readmitted to Imperial on February 1, 1995. Traci Foster, a nurse employed by Imperial at the time of Paul's second admission, testified that her supervisor, Anne Ndyetabula, copied orders for medication for Paul from a transfer form received from Ingalls onto a physician order sheet used by Imperial. Among the orders copied from the transfer form to the physician order sheet were: (1) an order for blood glucose monitoring to be conducted before meals and at bedtime; and (2) an order for various doses of Humulin R to be administered should Paul's blood glucose exceed specified limits. No Humulin N was ordered. Nurse Foster spoke with defendant by phone to confirm the orders included on the forms. Nurse Foster testified that, after defendant directed her to discontinue the orders for blood glucose monitoring and Humulin R, she wrote "D/C" next to each of these orders. Nurse Foster then faxed or telephoned the verified orders to the pharmacy. Defendant signed the orders two days later.

In addition, Nurse Foster read into the record her initial nursing note entered on February 1, 1995. Nurse Foster's note reflected a long-term diagnosis of dementia, Alzheimer's, seizure disorder, diabetes, a tumor of the lung, decubitus ulcers, fever and sepsis. The note recorded a decubitus ulcer four inches in diameter on Paul's tailbone and a 1- to 1½-inch diameter decubitus ulcer on his right heel. Upon admission, Paul was verbally unresponsive but responded to tactile stimuli by making eye contact. On defendant's cross-examination of Nurse Foster, the trial court sustained plaintiff's objections to several questions regarding Paul's condition subsequent to March 17, 1995, on the basis that such questions were irrelevant and beyond the scope of direct examination.

During Paul's second admission to Imperial, plaintiff visited Paul three times a day because he could not feed himself but refused to eat for the nursing staff. Plaintiff noticed that during this admission Paul "would mostly just be there. I mean, ask him questions and he would blink his eyes for answers. But he just slowly went down." Plaintiff testified that Paul would answer questions about whether he was in pain by blinking, "but sometimes it would confuse you." Plaintiff testified that Paul's appetite "slightened up" during his second admission to Imperial.

On February 20, 1995, plaintiff arrived at Imperial to feed Paul his lunch; however, when plaintiff began to feed him Paul started choking. Plaintiff ran to the nursing station and the nurses contacted defendant by telephone. Plaintiff spoke with defendant briefly and told him that Paul needed to go to the hospital. Defendant told plaintiff, "well, don't worry if he didn't eat for you, take him tomorrow," and hung up. Plaintiff returned to the nursing station and asked whether Paul had received his insulin. The nurse informed plaintiff that Paul was not on insulin. Paul's blood glucose level was then tested and was well above normal levels. Beginning at 2:30 p.m. on February 20, the nursing staff paged defendant three times. Plaintiff insisted that Paul be taken to the hospital immediately. When defendant had not returned the nursing staff's pages by 3 p.m., Paul was transferred to Ingalls Hospital at the direction of Imperial's director of nursing. Defendant finally called the nursing staff at 6 p.m. and ordered that Paul be transferred to Ingalls for evaluation.

Paul was admitted to Ingalls on February 20, 1995, with elevated blood glucose levels, dehydration, multiple decubitus ulcers, left lower lobe pneumonia and a urinary tract infection. Doctors at Ingalls inserted a central line to replenish fluids, inadvertently puncturing Paul's lung and causing a pneumothorax (collapsed lung). Doctors also determined that Paul had suffered a subendocardial myocardial infarc-

tion (minor heart attack). During Paul's stay at Ingalls, Paul contracted a right lower lobe pneumonia, urosepsis (a bladder infection) and an infection of the decubitus ulcer on his lower back. Paul was released from Ingalls and readmitted to Imperial on March 17, 1995. Paul subsequently died of unrelated causes on June 26, 1995.

Defendant testified that he continued the orders in effect at Ingalls upon Paul's readmission to Imperial on February 1, 1995; however, defendant acknowledged that he had signed the physician order form with the notation to discontinue Humulin R and blood glucose monitoring. Initially, defendant testified that he did not believe that the notation to discontinue was on the form at the time he signed it. Plaintiff's counsel presented a pharmacy copy of the order form along with a chart copy, which defendant agreed were identical carbon copies, except that the pharmacy copy was unsigned. Defendant then admitted that the language discontinuing Humulin R and blood glucose monitoring must have been on the form before defendant signed it.

Dr. Stuart Fine, a physician specializing in endocrinology, testified as an expert witness for plaintiff. Dr. Fine testified that blood glucose monitoring can be performed either (1) as a random test performed without respect to food consumption; or (2) as a fasting test performed only after a patient has not eaten for 12 hours. Dr. Fine testified that the normal level for a fasting blood glucose test would be between 70 and 100 milligrams per 100 cc. For a random test, any result above 140 would be considered abnormal. According to Dr. Fine, the action level—the level at which medical intervention is required—is 140 for a fasting result and 180 for a random blood glucose test. On February 20, 1995, Paul's blood glucose was 640. Dr. Fine opined that, even if defendant had not discontinued Humulin R, failure to prescribe Humulin N to Paul was a breach of the standard of care.

Dr. Fine further opined that the resulting insulin deficiency caused Paul to lapse into a hyperosmolar nonketotic coma. Dr. Fine explained that the term "hyperosmolar" refers to a state where the concentration of glucose in the blood increases and the blood becomes more viscous. Dr. Fine explained that high blood glucose levels (hyperglycemia) impair the ability of the body's white blood cells to travel throughout the body to fight infection. Because white blood cells then have to compete with the high blood sugar for oxygen, the white blood cells are less able to fight infection once they reach the site of an infection. Further, greater amounts of water are needed to flush glucose molecules from the bloodstream. As a result, Dr. Fine testified that defendant's failure to provide insulin proximately caused both Paul's left and right lobe pneumonia, the urinary tract infection, urosepsis,

aggravation of Paul's existing decubitus ulcers, a new decubitus ulcer on Paul's left hip, and dehydration. The dehydration necessitated insertion of a central line to replenish fluids. Paul's lung was punctured during the insertion of this central line, causing a pneumothorax. To repair the pneumothorax, the doctors at Ingalls had to insert a chest tube in a procedure "tantamount to injecting a knife, inserting a knife into the chest cavity and inserting a tube to suck out all the oxygen, all the air that was introduced when the pneumothorax was caused." The dehydration resulting from Paul's hyperglycemia also caused Paul to suffer a minor heart attack. Finally, Dr. Fine opined that the hyperglycemia caused Paul to become obtunded (less alert) to the point that by February 20, 1995, Paul was almost in full coma. Dr. Fine testified that each of the above-noted conditions is ordinarily accompanied by specific pain and discomfort. Finally, Dr. Fine testified that—with the exception of $1,063 for Dilantin and ferrous sulfate—all of the charges incurred by Paul during his admission at Ingalls resulted from the lack of insulin.

On cross-examination, Dr. Fine admitted that he had not deducted from Paul's medical bills the charges Paul would have incurred as a patient at Imperial had he not required hospitalization due to the insulin deficiency. When defense counsel attempted to question Dr. Fine regarding Paul's condition after being readmitted to Imperial on March 17, 1995, the following colloquy occurred:

"DEFENSE COUNSEL: And [Paul] continued to get decubiti care even after he had this episode of hyperglycemia all the way up until the time he died because he had those problems, true?

PLAINTIFF'S COUNSEL: Objection.

THE COURT: Sustained.

\* \* \*

DEFENSE COUNSEL: After [Paul] received the insulin post March 17th, the decubiti on his coccyx never healed, true?

PLAINTIFF'S COUNSEL: Objection.

THE COURT: Sustained.

DEFENSE COUNSEL: In fact, after [Paul] was well-controlled, his decubiti continued to progress as they had before the incident, true?

PLAINTIFF'S COUNSEL: Objection.

THE COURT: Sustained."

After plaintiff rested, the parties stipulated to the admission into evidence of certain medical records. Plaintiff's counsel clarified, for the record, that the stipulation was to: (1) the pharmacy records; (2) the records from Ingalls for the period from February 20 through March 17, 1995; (3) the records from Imperial from February 1

through February 20, 1995; (4) the records from Imperial from January 13 through January 19, 1995; and (5) two diabetic data sheets from Ingalls. The court then admitted these exhibits into evidence.

Defendant called two expert witnesses on his behalf, Dr. Henry Danko and Dr. Renee Santos. Dr. Danko testified that diabetics are generally more prone to infections—including urinary tract infections and pneumonia—and, if their nerves malfunction such that they do not feel pain normally, diabetics can be at "great risk for bed sores." Dr. Danko also testified that, despite being on Humulin N and Humulin R during his admission to St. James, Paul's decubitus ulcers worsened. Dr. Danko opined that Paul's elevated blood glucose level on February 20, 1995, and his admission to Ingalls on that date resulted from an infection. Dr. Santos opined that Paul did not appear to have pneumonia at the time of his admission to Ingalls but, rather, suffered atelectasis, a partial collapse of the lung common in bedridden patients. Dr. Santos also noted that the ulcers on Paul's lower back and on his heels did not appear to be infected.

Before defendant's final witness testified, the trial court ruled based upon the agreement of that parties that, absent a specific request from the jury, no exhibits would be sent back to the jury during deliberations. Defense counsel then informed the trial court that he had understood, prior to trial, that the parties agreed to stipulate that all the medical records would be admitted into evidence but noted that plaintiff's counsel had submitted only those noted above. Defense counsel then wished to additionally submit medical records pertaining to Paul's care after March 17, 1995. Plaintiff's counsel responded that he had understood that the parties agreed only that no foundation would be necessary for admission of medical records. Though plaintiff's counsel initially asserted that the post-March 17 records were irrelevant, he ultimately agreed to allow them into evidence.

The jury returned a verdict in favor of plaintiff and awarded plaintiff $55,172 for medical expenses, $385,000 for aggravation of Paul's preexisting medical conditions, and $1,060,000 for pain and suffering. A setoff of $125,000 was applied in light of plaintiff's settlement with Imperial. Defendant filed a posttrial motion seeking judgment notwithstanding the verdict, a new trial, or a substantial remittitur. The trial court granted a remittitur of $1,063 as to the medical expense award but otherwise denied defendant's posttrial motion. Defendant appeals.

## ANALYSIS

### I. Cross-Examination

On appeal, defendant first argues that the trial court erred in

limiting defendant's cross-examination of plaintiff, Nurse Foster, and Dr. Fine. In his posttrial motion, however, defendant challenged only the limitation of his cross-examination of Nurse Foster and Dr. Fine. Accordingly, defendant has waived any argument that the trial court improperly limited his cross-examination of plaintiff. *Mazurek v. Crossley Construction Co.*, 220 Ill. App. 3d 416, 422 (1991) (to preserve issue for appeal, party must raise the issue in a timely posttrial motion).

■ Defendant argues that the trial court improperly prohibited defendant from cross-examining both Nurse Foster and Dr. Fine as to Paul's condition following readmission to Imperial on March 17, 1995. Cross-examination is generally limited to the scope of the direct examination. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 105 (1995). However, circumstances resting within the witness's knowledge may be developed on cross-examination that explain, qualify, discredit, or destroy the witness's direct testimony, even though that material may not have been raised on direct examination. *Leonardi*, 168 Ill. 2d at 105-06. The scope of cross-examination rests within the sound discretion of the trial court and will not be disturbed on appeal absent abuse of that discretion. *Leonardi*, 168 Ill. 2d at 102.

■ Defendant acknowledges that he failed to make an offer of proof with respect to the excluded testimony of both Nurse Foster and Dr. Fine. Ordinarily, where a party fails to make an offer of proof as to excluded testimony, that party waives any claim that the testimony was improperly excluded. *Hall v. National Freight, Inc.*, 264 Ill. App. 3d 412, 420 (1994). The requirement that a party make an offer of proof, however, is not absolute. In *Creighton v. Elgin*, 387 Ill. 592 (1944), our supreme court held:

"It is not necessary that an offer of proof be made where the question shows the purpose and materiality of the evidence. It is not necessary that counsel state what the answer would be. If a question is in proper form and clearly admits of an answer relative to the issues, the party by whom the question is propounded is not bound to state facts proposed to be proved by the answer unless the court requires him to do so." *Creighton*, 387 Ill. at 606.

Further, this court has held that an offer of proof is not required if it is apparent that the trial judge understood the nature of the objection and the character of the evidence sought to be introduced or if the questions themselves and circumstances surrounding them show the purpose and materiality of the evidence. *Bafia v. City International Trucks, Inc.*, 258 Ill. App. 3d 4, 7-8 (1994). Finally, a party will not waive an argument by failing to make an offer of proof where the attitude of the trial court prevents a party from making an offer of proof. *Hall*, 264 Ill. App. 3d at 420.

## A. Nurse Foster

■ Defendant argues that, had he been permitted to cross-examine Nurse Foster regarding Paul's condition after his readmission to Imperial on March 17, Nurse Foster "could have explained to the jury that while receiving blood glucose monitoring and regular insulin, [Paul] continued to develop many of the same conditions (dehydration, pneumonia, urinary tract infects, and decubitus ulcers) that Dr. Fine had opined were cause by a lack of insulin." Defendant contends that the questions posed to Nurse Foster on cross-examination coupled with Paul's stipulated medical records demonstrate the purpose and materiality of the excluded testimony, thus obviating the need for an offer of proof. See *Creighton*, 387 Ill. at 606; *Bafia*, 258 Ill. App. 3d at 7-8. Further, defendant argues that the trial court prevented defendant from making an offer of proof by summarily denying defense counsel's three attempts "to be heard" during cross-examination. See *Hall*, 264 Ill. App. 3d at 420.

Even assuming, *arguendo*, that defendant's failure to make an offer of proof did not result in waiver of his challenge to the exclusion of Nurse Foster's testimony, we find no error in the trial court's ruling. Nurse Foster never testified on direct examination with respect to Paul's condition subsequent to his March 17 readmission to Imperial. The proposed cross-examination would thus have improperly exceeded the scope of direct examination. *Leonardi*, 168 Ill. 2d at 105.

Defendant asserts that cross-examination regarding Paul's condition after March 17 was nonetheless proper because a litigant may properly cross-examine a witness regarding facts that "explain, qualify, discredit, or destroy the witness' direct testimony, even though that material may not have been raised on direct examination" (*Leonardi*, 168 Ill. 2d at 105-06). Defendant argues that Nurse Foster could have explained to the jury that, even after receiving blood glucose monitoring and regular insulin, Paul continued to develop many of the same conditions that Dr. Fine opined were caused by defendant's failure to provide blood glucose monitoring and insulin. While such testimony might well have served to discredit *Dr. Fine's* subsequent testimony regarding causation, defendant fails to suggest how the excluded testimony would "explain, qualify, discredit, or destroy" *Nurse Foster's* direct testimony. Because a party may not exceed the scope of direct examination as a means of presenting his or her theory of the case on cross-examination (*Anderson v. Human Rights Comm'n*, 314 Ill. App. 3d 35, 44 (2000)), any value the excluded testimony might have had in rebutting plaintiff's case as a whole is irrelevant to our analysis here. The excluded testimony was both beyond the scope of Nurse Foster's direct testimony and would not "explain, qualify, discredit, or destroy"

Nurse Foster's direct testimony. The trial court thus did not abuse its discretion in limiting defendant's cross-examination of Nurse Foster. *Leonardi*, 168 Ill. 2d at 105.

## B. Dr. Fine

■ Defendant further asserts that he should have been allowed to cross-examine Dr. Fine as to Paul's condition after March 17. Plaintiff responds that defendant waived any claim of error regarding his cross-examination of Dr. Fine by failing to make an offer of proof after the trial court sustained plaintiff's objection. Where it is not clear from the record what the witness would have answered, what the basis for his answer would have been, or what purpose his answer would have served, the failure to make an offer of proof will result in waiver of a challenge to the exclusion of testimony. *Moore v. Swoboda*, 213 Ill. App. 3d 217, 237-38 (1991). Defendant argues that an offer of proof was unnecessary because "the nature of the objection and the character of the evidence sought to be introduced" were apparent and " 'the questions themselves and the circumstances surrounding them show the purpose and the materiality' " of the testimony defendant sought to elicit. *Bafia*, 258 Ill. App. 3d at 7, quoting *Volvo of America Corp. v. Gibson*, 83 Ill. App. 3d 479, 491 (1980).

Defendant argues that the questions posed, in conjunction with the stipulated medical records, clearly demonstrate that the purpose of the questioning was to establish that, even after receiving adequate treatment of his diabetes, Paul nonetheless continued to suffer from many of the same conditions that Dr. Fine opined were caused by defendant's failure to properly treat Paul's diabetes. We note initially that the stipulated medical records regarding Paul's condition subsequent to March 17 were not admitted into evidence until well after Dr. Fine had finished testifying and thus cannot have formed a foundation demonstrating to the trial court the purpose and materiality of the questions. Defendant's first argument fails.

In any case, this court may affirm a trial court's decision to exclude testimony on any ground apparent in the record, regardless of whether the trial court relied on those grounds. *Bafia*, 258 Ill. App. 3d at 8-9. In the instant case, the record reflects that defendant failed to establish that Dr. Fine had personal knowledge as to Paul's condition following Paul's readmission to Imperial on March 17. Although Dr. Fine testified that he reviewed "the nursing home records, the actual medical records from Imperial," and specifically testified that he had reviewed records from both Paul's first and second admissions, Dr. Fine never specifically testified that he had reviewed medical records relating to Paul's condition following his third admission to Imperial on March 17.

Furthermore, defendant failed to establish the underlying premise of his cross-examination questions—that Paul's blood glucose was "well-controlled" subsequent to March 17. Defendant argues that any problems which Paul suffered after March 17 would tend to "explain, qualify, discredit or destroy" Dr. Fine's testimony that Paul's injuries were caused or aggravated by defendant's negligence. Unless Paul was receiving appropriate monitoring and adequate insulin under the standards described by Dr. Fine, however, evidence of Paul's condition after March 17 might instead simply reflect a subsequent doctor's negligent care. Absent a foundation establishing Paul's blood glucose levels or the amount of insulin that Paul received following his March 17 readmission to Imperial, the line of questioning that defendant sought to pursue was properly barred as irrelevant.

Because defendant failed to lay a foundation establishing either that Dr. Fine had knowledge of Paul's condition or care after March 17 or that Paul's blood glucose was well-controlled after that date, we affirm on this ground the trial court's ruling limiting defendant's cross-examination of Dr. Fine. See *Bafia*, 258 Ill. App. 3d at 9.

## II. Pain and Suffering

■ Defendant next argues that the trial court erred in denying defendant's motion for judgment notwithstanding the verdict because the evidence adduced at trial was insufficient to support an award for pain and suffering. A motion for judgment notwithstanding a verdict should be granted only where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). We review a trial court's decision to grant or deny judgment notwithstanding the verdict *de novo. McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999).

In the alternative, defendant argues that the pain and suffering award is against the manifest weight of the evidence and that he is therefore entitled to a new trial. A verdict is against the manifest weight of the evidence if the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence. *Demos v. Ferris-Shell Oil Co.*, 317 Ill. App. 3d 41, 52 (2000).

■ An award for pain and suffering is proper where there is evidence of physical injury. *Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150, 175 (1995). To recover damages for pain and suffering, Illinois courts have further required evidence that the injured party was conscious of his or her pain and suffering. *Ellig v.*

*Delnor Community Hospital,* 237 Ill. App. 3d 396, 401-02 (1992). Medical testimony establishing consciousness is not required; rather, lay testimony describing the injured party's actions together with evidence concerning the injuries is sufficient to support a pain and suffering claim. *Ellig,* 237 Ill. App. 3d at 402. However, the evidence presented must provide more than "mere speculation that the [injured party] was conscious and suffered pain." *Ellig,* 237 Ill. App. 3d at 402.

Defendant acknowledges that Dr. Fine testified that Paul suffered conscious pain as a result of defendant's negligence but contends that Dr. Fine's testimony was based solely on "what pain could accompany [Paul's] aggravated conditions, not what pain and suffering [Paul] actually sustained." Defendant further argues that Dr. Fine admitted that he did not find any evidence in Paul's medical records indicating that Paul had experienced pain. Defendant argues that Dr. Fine's testimony was thus merely unsupported speculation, insufficient to support a pain and suffering award. We disagree. Dr. Fine's opinion was based on the pain likely to accompany dehydration, infected decubitus ulcers, heart attack, pneumonia, pneumothorax, urinary tract infection, and insertion of a central line. Evidence that a given injury is likely to cause pain is certainly relevant to the determination of whether the injured party in fact suffered pain. See *Voykin v. Estate of DeBoer,* 192 Ill. 2d 49, 57 (2000) (evidence that has any tendency to make the existence of a material fact more probable or less probable than it would be without the evidence is relevant); *Holston,* 165 Ill. 2d at 173-74 (jury allowed to infer pain and suffering based on evidence regarding the injuries).

Defendant further acknowledges plaintiff's testimony that Paul, though nonverbal, was able to communicate with plaintiff by blinking his eyes and by this method indicated that he was in pain. Defendant argues that plaintiff conceded the speculative nature of this testimony by testifying that Paul's responses could sometimes be confusing. Defendant, however, did not contend before either this court or the trial court that the potentially confusing nature of Paul's responses rendered plaintiff's testimony regarding those responses inadmissible.

In addition, Dr. Santos testified that Paul's medical records included a February 24 notation by Dr. Winter that Paul "continue[d] to have pleuritic pain." According to Dr. Santos, "pleuritic pain" refers to pain in the chest upon taking a deep breath. Defendant argues that there is no evidence that the pleuritic pain noted by Dr. Winters was attributable to any injury proximately caused by defendant's negligence and contends that it is equally possible that Paul's pleuritic pain was caused by a lung tumor noted in Paul's admission records. Defendant therefore contends that the conclusion that

Paul's pleuritic pain was caused by defendant's negligence is purely speculative.

Causation may be established by facts and circumstances that, in the light of ordinary experience, reasonably suggest that the defendant's negligence operated to produce the injury. *Wiegman v. Hitch-Inn Post of Libertyville, Inc.*, 308 Ill. App. 3d 789, 795 (1999). It is also not necessary that only one conclusion follow from the evidence. *Wiegman*, 308 Ill. App. 3d at 795. However, where from the proven facts the nonexistence of the fact to be inferred appears to be just as probable as its existence, then the conclusion that the fact exists is a matter of speculation, surmise, and conjecture, and the trier of fact cannot be allowed to draw it. *Wiegman*, 308 Ill. App. 3d at 795-96. As plaintiff correctly points out, no evidence was presented regarding the nature of Paul's lung tumor or whether that condition caused or was likely to cause Paul pain. In contrast, Dr. Fine testified that pneumothorax causes a "severe degree of discomfort from being unable to get the necessary oxygen." In light of this evidence, we reject defendant's contention that Paul's pleuritic pain was just as likely to have been caused by a lung tumor as by defendant's negligence.

Finally, Dr. Santos testified that Paul's medical records reflect that he withdrew from painful stimuli. Defendant, arguing that this evidence does not establish that the conditions resulting from or aggravated by defendant's negligence caused Paul pain, misses the point. The fact that Paul withdrew from painful stimuli was introduced to establish that Paul was in fact capable of feeling pain. Thus, the evidence, viewed in the light most favorable to plaintiff, establishes that: (1) Paul was capable of feeling conscious pain; (2) the conditions caused or aggravated by defendant's negligence were likely to cause pain; (3) Paul communicated to his wife that he experienced pain; and (4) Dr. Winters noted and documented that Paul suffered pleuritic pain. From this evidence, the jury reached the reasonable conclusion that Paul endured pain and suffering as a result of defendant's negligence. Because the evidence does not so overwhelmingly favor defendant that this jury's verdict cannot stand (*Pedrick*, 37 Ill. 2d at 510), the trial court did not err in denying defendant's motion for judgment notwithstanding the verdict. Further, because the jury's conclusion was not unreasonable or arbitrary and was properly based upon the aforementioned evidence (*Demos*, 317 Ill. App. 3d at 52), defendant is not entitled to a new trial.

## III. Remittitur

■ Finally, defendant argues that he is entitled to a substantial remittitur. Defendant first asserts that the $1,060,000 pain and suffer-

ing award exceeds the limits of fair and reasonable compensation. The determination of damages is a question reserved to the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court. *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997). Reviewing courts will not interfere with the jury's assessment of damages unless a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered. *Gill v. Foster*, 157 Ill. 2d 304, 315 (1993). An award of damages will be deemed excessive if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience. *Richardson*, 175 Ill. 2d at 113.

According to defendant, the "only explanations for the jury's $1,060,000 [pain and suffering] award" are: (1) the jury was impassioned and prejudiced by Paul's overall condition; or (2) the jury thought plaintiff was entitled to an award for all his pain and suffering and not just the pain and suffering which resulted from defendant's negligence. We disagree. Evidence was presented indicating that defendant's negligence caused Paul to become hyperglycemic, which in turn caused him to become obtunded and dehydrated. The dehydration necessitated insertion of a central line to replenish fluids. Paul's lung was punctured during insertion of the central line, resulting in a pneumothorax which left Paul unable to get enough oxygen. Repair of the pneumothorax required insertion of a chest tube through a procedure which was "tantamount to injecting a knife *** into the chest cavity." Due to dehydration, Paul suffered a minor heart attack. Because the hyperglycemia impaired the ability of Paul's white blood cells to fight infection, Paul developed a urinary tract infection, two separate pneumonias, and new decubitus ulcers on his hip. Ulcers that had developed prior to the hyperglycemic episode increased in size and were deprived of the opportunity to heal. As defendant correctly notes, the above-described pain and suffering was inflicted on a man already enduring significant pain and suffering. Under these circumstances, we cannot hold that the jury's award of $1,060,000 was the result of passion or prejudice or "shocks the judicial conscience" (*Richardson*, 175 Ill. 2d at 113). Cf. *Chambers v. Rush-Presbyterian-St. Luke's Medical Center*, 155 Ill. App. 3d 458 (1987) (upholding award for $800,000 where plaintiff lapsed into a four-month hyperosmolar nonketotic coma following negligent failure to provide insulin); but see also *Richardson*, 175 Ill. 2d at 114 (noting that Illinois courts have traditionally declined to compare amounts awarded in other cases in determining whether a particular damage award is excessive).

Defendant also argues that he is entitled to remittitur because

portions of the award for medical expenses are duplicative.[1] Defendant notes that Dr. Fine testified that even if Paul had not been hospitalized on February 20, 1995, Paul would still have needed mattress pads and peri washes for decubiti care, would have paid for room and board at the nursing home, would have needed blood glucose monitoring, Humulin N and Humulin R, and would have needed Foley catheters and Foley care. Defendant therefore argues that the hospital charges for each of these items were either unrelated to defendant's negligence or overstated the amount attributable to defendant's negligence. Defendant further argues that, because defendant had recommended insertion of a gastric feeding tube in January 1995, charges related to the feeding tube were not attributable to defendant's negligence.[2]

In support of these arguments, defendant cites *Gill v. Foster*, 157 Ill. 2d 304 (1993). In *Gill*, the plaintiff underwent surgery for chronic reflux esophagitis at St. John's Hospital in Springfield, Illinois. *Gill*, 157 Ill. 2d at 307. After plaintiff's release from St. John's, plaintiff began experiencing complications and was admitted by his family physician, Dr. C.F. Aquino, to St. Francis Hospital in Litchfield, Illinois. *Gill*, 157 Ill. 2d at 307. Plaintiff was then transferred to Memorial Medical Center, where Dr. James Rogers discovered that plaintiff's stomach was trapped in his chest cavity. *Gill*, 157 Ill. 2d at 307. Dr. Rogers performed an abdominal incision and attempted to reduce the stomach back into the abdominal cavity but was prevented from accomplishing this task by the degree of inflammation. *Gill*, 157 Ill. 2d at 307. Dr. Rogers then opened the chest cavity and discovered that a nasal gastric tube inserted at St. Francis had punctured the plaintiff's stomach and that the leaking contents caused an infection and inflammation over the plaintiff's left lung. *Gill*, 157 Ill. 2d at 308. The plaintiff brought suit against, *inter alia*, Dr. Aquino.

At trial, the plaintiff sought to introduce bills from Memorial Medical Center and from Dr. Rogers as proof of damages. *Gill*, 157 Ill. 2d at 311. The trial judge excluded the two bills "because the plaintiff

---

[1]Though defendant couches his argument in terms of "duplicative" damages, defendant does not suggest that plaintiff received a double recovery for any expense. Instead, defendant contends that any expenses that Paul would have incurred regardless of the hyperglycemic episode are unrelated to defendant's negligence. More artfully framed, defendant is challenging the jury's determination that certain expenses were proximately caused by defendant's negligence.

[2]Defendant fails to note, however, that Dr. Fine unequivocally testified that in his opinion, to a reasonable degree of medical certainty, Paul would never have needed a gastric feeding tube had he not undergone the hyperglycemic episode.

made no effort to separate which charges on the bills would necessarily have been incurred as the natural result of a necessary repair surgery for a herniated stomach, and which, if any, were incurred as the result of something chargeable to *** Dr. Aquino's negligence." *Gill*, 157 Ill. 2d at 311. The trial judge also refused to admit the testimony of a witness who would have testified regarding the average cost for repair of a herniated stomach, commenting, " 'You have a situation that, to me, is very well-suited to breaking [the costs] down [into those for repair of the herniated stomach and those necessary to remedy the injury caused by Dr. Aquino's negligence]. You just haven't brought anybody in to do it.' " *Gill*, 157 Ill. 2d at 312.

On appeal, our supreme court noted that "[i]n proving damages, the burden is on the plaintiff to establish a reasonable basis for computing damages." *Gill*, 157 Ill. 2d at 313. The court found that the voluminous medical bills could have misled or confused the jury as to the extent of damages caused by Dr. Aquino's negligence and therefore held that the trial judge acted within his discretion in excluding the bills. *Gill*, 157 Ill. 2d at 313. In the instant case, unlike the situation presented in *Gill*, Dr. Fine specifically identified the charges included in Paul's bill which he believed were related to defendant's negligence and those which he believed were unrelated. Furthermore, because defendant does not challenge the admission of Paul's hospital bills but only the conclusion reached by the jury based on those bills, the portion of *Gill* cited by defendant is inapplicable to the instant case.

Defendant's assertion that, as a matter of law, he should not be held liable for the cost of Paul's hospital room because Paul "would have paid for a bed to sleep in at the nursing home" anyway appears to be without precedent in Illinois law. We reject this assertion emphatically. It is well established that the determination of damages is a question reserved to the trier of fact. *Richardson*, 175 Ill. 2d at 113. Similarly, it is the province of the jury to decide what damages were proximately caused by the defendant's negligence. *Buchaklian v. Lake County Family Young Men's Christian Ass'n*, 314 Ill. App. 3d 195, 205 (2000). In the instant case, the jury chose to reject defendant's argument that defendant was not liable for certain hospital charges because Dr. Fine testified that certain care would have been necessary regardless of defendant's negligence. We decline to substitute our judgment for that of the jury in this matter. *Richardson*, 175 Ill. 2d at 113.

965

## IV. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

COUSINS and McNULTY, JJ., concur.