FIFTH DIVISION
June 11, 2010

No. 1-09-0381

| | | |
|---|---|---|
| KEENAN STAPLETON, a Minor, By and Through His Parent and Next Friend, Felicia Clark, and FELICIA CLARK, Individually, | ) ) ) ) | Appeal from the Circuit Court of Cook County, |
| Plaintiffs-Appellants, | ) ) | 04 L 2894 |
| v. | ) ) | The Honorable |
| MONICA MOORE, | ) ) | Clare Elizabeth McWilliams, Judge Presiding. |
| Defendant-Appellee. | ) | |

PRESIDING JUSTICE TOOMIN delivered the opinion of the court:

In this appeal, we determine whether the use of a medical journal article on cross-examination of an expert is permissible, when only the reliability of the author is established and not the reliability of the particular article or text itself. Plaintiff, Felicia Clark, individually, and on behalf of Keenan Stapleton, a minor, appeals from the entry of judgment on a jury verdict in favor of defendant in her action for medical malpractice arising from an injury suffered by Keenan during delivery. Plaintiff asserts the following errors: (1) the trial court erred in allowing defendant to use a journal article in cross-examining plaintiff's expert because, *inter alia*, the article was not disclosed prior to trial; (2) the trial court erred in instructing the jury as to the proper standard of care; (3) the trial court erred in granting defendant's motion *in limine*, barring any testimony as to whether an "arrest of labor" took place; and (4) the testimony of the attending resident doctor, Dr. Meininger, at trial that his medical record notation was in error violated Supreme Court Rule 213 (210 Ill. 2d R. 213). For the following reasons, we affirm.

BACKGROUND

Keenan Stapleton was born on July 17, 2003, at about 38 weeks of gestation. During the birth, Keenan's mother, plaintiff Felicia Clark, was told by her doctor, Dr. Monica Moore, that the baby was being "stubborn" and that she should push to help in the delivery. After the delivery, Dr. Moore told plaintiff that she should probably get Keenan's arm checked out. However, Dr. Moore did not explain why she said this. Plaintiff described Keenan's arm as very limp and hanging to the side. No one at Rush Memorial Hospital explained to plaintiff what was wrong with Keenan's arm. Keenan was otherwise healthy and weighed 9 pounds, 5 ounces.

Dr. Moore's chart indicates a note made shortly after Keenan's birth that there was a normal spontaneous vaginal delivery with shoulder dystocia, which means a difficult delivery of a baby's shoulders. Shoulder dystocia is a medical emergency because the baby must be delivered in a short time frame or it could die or sustain brain damage. Shoulder dystocia can be addressed in a variety of ways, the McRoberts maneuver, where the mother is repositioned with her legs up and back, or through the application of suprapubic pressure. The suprupubic pressure is intended to push and dislodge the baby's trapped anterior shoulder. In plaintiff's case, the McRoberts maneuver and application of suprapubic pressure were successfully used. Dr. Moore's note indicates only 40 seconds passed from the time she recognized the shoulder dystocia to the time Keenan was actually delivered. However, this note also includes a cross-out, now illegible, notation with the word "error" written next to it.

Keenan suffered a permanent left-side brachial plexus injury called Erb's palsy. The brachial plexus is a group of nerves that extends from the spinal cord, at the cervical and thoracic

2

vertebrae, down to the muscles of the shoulder, arm, forearm and hand. These nerves can become permanently damaged in babies as a result of stretching between the neck and shoulder on either side, occurring most often during shoulder dystocia.

Plaintiff filed the instant proceedings against Dr. Moore, alleging that in the course of the delivery Dr. Moore had applied greater-than-gentle traction to Keenan's head, causing him to sustain the brachial plexus injury. In defense, Dr. Moore maintained that the injury was not caused by any traction applied by her, but rather from the force of uterine contractions on Keenan's body when his left shoulder caught on a ridge in the sacral promontory area of plaintiff's spine.

Dr. Moore's notes do not indicate the orientation of Keenan's head or which shoulder was involved with the shoulder dystocia. However, the chart entries include a note written by a medical student, Alex Meininger, indicating a "normal spontaneous delivery with shoulder dystocia for 40 seconds reduced with McRoberts maneuvers and suprapubic pressure and secondary perineal laceration." Meininger also noted "LOA," indicating left shoulder dystocia anteriorly, meaning that Keenan's left shoulder was positioned toward the front, under plaintiff's pubic symphysis. However, this notation conflicted with Meininger's further notation that Keenan's head was also "LOA." Meininger testified that he obtained this information from directly observing the delivery, the residents, and from Dr. Moore. Meininger testified that he must have been confused when he indicated left shoulder dystocia anteriorly in the chart, because with LOA, the right shoulder would be anterior. He had only been documenting in patient charts for 7 to 10 days at that time, and this notation seemed to be an error. Further, this was the only

conflict in the records, as the delivery note and the labor and delivery summary both indicated LOA for Keenan's position.

Dr. Moore testified that while she had received training regarding treatement of shoulder dystocia, prior to Keenan's case she had encountered only one instance of that condition. According to the doctor, there was no point in time that she believed she needed to get Keenan delivered quickly because his life was in jeopardy. Dr. Moore explained that she called in a pediatric resident, Dr. Emily Sifferman, because of fetal decelerations occurring with pushing. Dr. Moore testified she was not too concerned with the decelerations but called Sifferman just in case something happened. With respect to Meininger's note, Dr. Moore stated that because of the LOA position of Keenan's head, the left shoulder could not have been anterior. Dr. Moore testified she did not know how Meininger got the information about the left shoulder being anterior.

Dr. Moore independently recollected plaintiff's labor and the delivery of Keenan. Also present at the delivery were a resident, Dr. Carrie Smith, a nurse, and the pediatric resident, Dr. Sifferman. Dr. Moore remembered that the nurse had one of plaintiff's legs up and back, but could not recall which leg, and could not remember who was holding plaintiff's other leg. Dr. Smith applied the suprapubic pressure. Dr. Moore told plaintiff she really needed to push to help get the baby out. After a very short period of time, Dr. Moore guided the anterior shoulder out, and Dr. Smith pushed down and Keenan's shoulder "popped right out." According to Dr. Moore, the simultaneous combination of a last contraction by plaintiff, traction applied by Dr. Moore, and the suprapubic pressure caused the anterior shoulder to pop out and the rest of Keenan's body to

be delivered.

Dr. Moore denied applying any upward traction during Keenan's delivery, because this would work against the application of downward suprapubic pressure. Dr. Moore also denied applying any excessive downward traction, and also denied pulling or twisting Keenan's head. After Keenan's head was delivered, plaintiff moved far up on the bed, and Dr. Moore's hands were on Keenan's head for some portion of the distance that plaintiff moved up and away. Dr. Moore conceded that she had testified at her deposition that during the time plaintiff was pushing, about 10 seconds, she applied "probably medium" force on Keenan's head. Dr. Moore agreed that the standard of care would allow for the use of gentle lateral traction to deliver a baby when shoulder dystocia is present, although Dr. Moore maintained what is "gentle" differs from person to person and is subjective. Dr. Moore agreed that using greater-than-gentle lateral traction on a baby with shoulder dystocia would be a deviation from the standard of care absent a life-threatening scenario. She further testified that the amount of traction she applied was "nowhere near excessive" and that she does not know why Keenan suffered his injury. Dr. Moore remembers after the delivery thinking it was strange that Keenan's left shoulder was injured, because his right shoulder was the one under plaintiff's pubic bone. Dr. Moore denied violating the standard of care in Keenan's case and had the opinion, within a reasonable degree of medical certainty, that nothing she did caused the injury.

Plaintiff's obstetric expert, Dr. Stuart Edelberg, was board certified in obstetrics and gynecology and had been practicing in obstetrics for over 40 years. Dr. Edelberg indicated he thought Meininger's "LOA" notation was mistaken and should have indicated "ROA" (right

occiput anterior) for Keenan's head position, which would have been consistent with Keenan's left arm being anterior. Dr. Edelberg reviewed the labor and delivery summary and felt that the left shoulder was anterior because anterior shoulder dystocia is statistically more likely. In any event, the left arm could have been injured whether the left shoulder was anterior or posterior, and the actual position did not impact Edelberg's opinions.

In Edelberg's opinion, shoulder dystocia is a medical emergency. The standard of care requires a physician to perform the recognized maneuvers for delivery of a shoulder dystocia, including the McRoberts maneuver and the application of suprapubic pressure. Any pressure on the head used to relieve shoulder dystocia has to be gentle lateral pressure. Edelberg opined that Keenan's brachial plexus injury occurred because there was "excess lateral traction" placed by Dr. Moore on Keenan's head. Traction refers to placing pressure on the baby's head, which stretches the brachial plexus. If the left shoulder was anterior during Keenan's birth, excess downward lateral traction was applied. Even accounting for the inconsistency in the medical records, if the left shoulder was posterior, then excess upward lateral traction was applied. In Keenan's case, according to Edelberg, the application of greater-than-gentle lateral traction caused Keenan's permanent injury and was a deviation from the standard of care. Edelberg eliminated all other possible causes of the injury, including malpositioning during labor, which usually involves very small babies descending down the birth canal with a neck presentation or a prolapse arm. According to Edelberg, transient brachical plexus injuries can result from pressure inside the womb, and without any physician negligence, but permanent brachial plexus injuries are different because they result from lateral force. Also, any uterine contractions or forces would result in

6

bruising of the skin and muscular tissue and would be equally exerted on the baby, not greater on one side.

On cross-examination, Dr. Edelberg was questioned about various medical journal articles expressing the view that brachial plexus injuries are more likely caused by the endogenous forces of the mother during delivery of the baby, rather than external traction. However, according to Edelberg, some of these opinions were based on research using a computer model and, for the most part, related to transient, rather than permanent, brachial plexus injuries. Although defendant sought to introduce the testimony of Dr. Michele Grimm, one of these authoring doctors, regarding the use of computer model information, the trial court barred such testimony, finding that it did not comply with *Frye's* general acceptance requirement. See *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

Over plaintiff's objections, Edelberg was also confronted with an article written by Dr. Lerner and Dr. Salamon, which reported a case of a baby born vaginally without physician traction that resulted in permanent brachial plexus injury. Edelberg later testified that the article related to a case in which Dr. Lerner was the defense expert for Dr. Salamon. Although plaintiff objected on the basis of nondisclosure pursuant to Supreme Court Rule 213, the court allowed the testimony for impeachment, notwithstanding Rule 213's proscriptions. Edelberg discounted the validity and application of the article to the case at trial.

Further, Edelberg was questioned about the 2005 PRECIS, a text by the American College of Obstetrics and Gynecology (ACOG), which acknowledges that though textbooks in the past stated that brachial plexus palsy is caused by the application of excessive lateral traction,

evidence over the years emerged that in fact most brachial plexus palsies are not caused by traction and occur in uncomplicated vaginal deliveries. The PRECIS text also states most brachial plexus injuries occur because an infant presents in the mother's pelvis in the left occiput anterior position, where the infant's right arm is more likely to get caught under the mother's pubic bone, but brachial plexus also occurs in the arm that presents posteriorly. Additionally, Dr. Edelberg was questioned concerning an article on brachial plexus palsy involving the posterior shoulder, stating that it is most likely that maternal expulsive forces of delivery may be partly or totally responsible where, for example, the posterior shoulder may become temporarily lodged behind the sacral promontory.

Plaintiff's pediatric neurology expert, Dr. Steward Ater, was board certified in pediatrics and neurology with special qualifications in child neurology. Dr. Ater testified that Keenan had a left obstetrical brachial plexus palsy. Ater concluded that Keenan's brachial plexus injury occurred in the delivery process after the shoulder dystocia was encountered, that he suffers from Erb's palsy, and the injury was permanent. Dr. Annitta John, a board-certified pediatrician who had treated Keenan from the time he was two weeks old up to the time of trial, stated that Keenan could not extend his left arm out further than approximately a 100-degree angle, but did not note any loss of strength in that arm, a fact Dr. John attributed to the therapy he had received.

Defendant's expert, Dr. Mark Neerhof, was board certified in general obstetrics/ gynecology and in maternal-fetal medicine (high-risk obstetrics). Dr. Neerhof opined that Dr. Moore did not use excessive traction because there was nothing in the medical records indicating the use of excessive traction, no one in the room stated Dr. Moore used excessive traction, and

Dr. Moore herself maintained that she used gentle traction. Neerhof testified that gentle downward traction is within the standard of care. A gentle downward traction should always be used in order to effect a delivery. Neerhof testified that, though he did not know exactly when or how Keenan sustained his injury, nothing Dr. Moore did or failed to do caused it. Dr. Neerhof further testified that it was very likely that Keenan's injury occurred during the labor process, because of the fact that the injury occurred to Keenan's posterior shoulder.

Dr. Neerhof based his opinion on the assumption that Keenan was LOA and that Keenan's left arm was the posterior arm. Neerhof opined that Meininger's note indicating that Keenan's left arm was anterior was wrong and that Meininger had confused anterior and posterior. He also concluded that the pediatric resident's notation of left shoulder dystocia was wrong. According to Neerhof, Keenan's right shoulder was anterior and there was a right shoulder dystocia that was relieved in 40 seconds without any injury to the right shoulder, but the left shoulder got hung up on the sacral promontory before the right shoulder got stuck behind the pubic bone. Neerhof maintained that excessive downward traction only causes injury to the anterior arm and would not cause injury to the posterior arm. According to Neerhof, another possible cause of brachial plexus injury is the force of labor pushing down on the baby after the posterior shoulder gets hung up on the sacral promontory, which Neerhof opined most likely happened in this case. According to Neerhof, this conclusion is supported by medical literature indicating that permanent brachial plexus injuries occur to the posterior shoulder with or without shoulder dystocia. Neerhof maintained that the medical literature, including the article by Lerner, establishes that the forces of labor are a mechanism of brachial plexus injury and that brachial plexus injuries can occur in the

absence of excessive downward traction. Neerhof denied that the literature establishes that a permanent brachial plexus injury, as opposed to a transient injury, indicates the doctor applied excessive traction. Neerhof also disagreed with Edelberg's testimony that if Keenan was LOA, then Dr. Moore must have used excessive upward traction because the only evidence of upward traction was after delivery of the anterior shoulder, and Dr. Moore demonstrated that she was cautious in guiding Keenan by cupping her hand under the posterior shoulder.

Following the close of evidence, the jury returned a verdict in favor of defendant and against plaintiff. In turn, judgment was entered on the jury's verdict. The trial court denied plaintiff's posttrial motion for a new trial or, in the alternative, for a judgment notwithstanding the verdict. Plaintiff filed a timely notice of appeal.

## ANALYSIS

Plaintiff first asserts that the trial court erred in allowing the defense to employ the journal article, H. Lerner and E. Salamon, *Permanent Brachial Plexus Injury Following Vaginal Delivery Without Physician Traction or Shoulder Dystocia*, American Journal of Obstetrics and Gynecology (March 2008), on cross-examination of plaintiff's expert, Dr. Edelberg. Plaintiff maintains that the article was misleading, probably fraudulent, and not disclosed prior to trial in accordance with Supreme Court Rule 213 (210 Ill. 2d R. 213). Plaintiff also asserts that the trial court erred in limiting plaintiff's cross-examination of defendant's expert, Dr. Neerhof, concerning the Lerner article. Defendant responds that allowing use of such articles during cross-examination for impeachment is permissible and the article did not need to be disclosed pursuant to Rule 213.

An unbroken line of precedent holds that the admission of evidence and the scope of

cross-examination are issues within the sound discretion of a trial court, and a reviewing court will not reverse such rulings absent an abuse of discretion. See *Snelson v. Kamm*, 204 Ill. 2d 1, 33, 787 N.E.2d 796, 814 (2003); *People v. Ward*, 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702 (1984), citing *Veer v. Hagemann*, 334 Ill. 23, 28, 165 N.E. 175, 177 (1929), *Bosel v. Marriott Corp.*, 65 Ill. App. 3d 649, 654, 382 N.E.2d 587, 591 (1978), and *Fullerton v. Robson*, 61 Ill. App. 3d 93, 96, 377 N.E.2d 1044, 1047 (1978). See also *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 102, 658 N.E.2d 450, 459 (1995), citing *Sweeney v. Matthews*, 46 Ill. 2d 64, 71, 264 N.E.2d 170, 173 (1970). Further, a party is not entitled to reversal unless the error in evidentiary rulings was substantially prejudicial and affected the outcome of the trial. *Simmons v. Garces*, 198 Ill. 2d 541, 566-67, 763 N.E.2d 720, 736 (2002).

At the outset, we address defendant's contention that plaintiff failed to preserve this argument by interposing the proper objection. Plaintiff objected to the article on the basis of Rule 213, also asserting a lack of foundation, but did not expressly object based on the article's lack of authoritativeness. A party is required to make specific objections to evidence, based on particular grounds, and the failure to do so results in a waiver of objections as to all other grounds not specified or relied on. *Barreto v. City of Waukegan*, 133 Ill. App. 3d 119, 130, 478 N.E.2d 581, 589 (1985). Thus, we agree with defendant that plaintiff has forfeited her objection based on lack of authoritativeness.

We additionally find that defendant's claim of procedural default is enhanced by evidence supporting the defense assertion that Neerhof considered Dr. Lerner to be a reliable authority in the field of shoulder dystocia and brachial plexus injuries. A medical treatise or article may be

11

proven to be authoritative on such cross-examination where "the cross-examiner proves the author's competence by a witness with expertise in the subject matter." *Bowman v. University of Chicago Hospitals*, 366 Ill. App. 3d 577, 587, 852 N.E.2d 383, 392 (2006), citing *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 336, 211 N.E.2d 253, 259 (1965). Thus, through Neerhof, the competence of Dr. Lerner as an authority in the field was established.

Although plaintiff contends that the use of the Lerner article violated Rule 213, we find that contention to be of dubious merit. The disclosure requirements of Rule 213 simply do not apply to cross-examination of an opposing party's opinion witness. *Skubak v. Lutheran General Health Care Systems*, 339 Ill. App. 3d 30, 32, 790 N.E.2d 67, 70 (2003), citing *Maffett v. Bliss*, 329 Ill. App. 3d 562, 577, 771 N.E.2d 445, 458 (2002). "Supreme Court Rule 213(g) does not require that a party disclose journal articles that the party intends to use in cross-examining the opposing party's opinion witness." *Maffett v. Bliss*, 329 Ill. App. 3d 562, 577, 771 N.E.2d 445, 458 (2002). As the *Maffet* court recognized, "[i]ndeed, none of Rule 213's disclosure requirements applies to cross-examining an opposing party's opinion witness." *Maffett*, 329 Ill. App. 3d at 577, 771 N.E.2d at 458, citing 177 Ill. 2d R. 213(g).

The dissent maintains that the trial court committed not only error, but reversible error, "because defendant was allowed to repeatedly utilize the article in cross-examination without a sentence of testimony stating that the article itself was reliable." Slip. op. at 32. The dissent finds problematic that Dr. Edelberg essentially endorsed the reliability of the author, rather than the article itself. We pause to reiterate the long-standing Illinois precedent requiring a proper foundation for impeachment of an opposing party's expert with medical articles and texts. It is

well settled that "[t]he *author's* competence is established if the judge takes judicial notice of it, or if it is established by a witness expert in the subject." (Emphasis added.) *Darling*, 33 Ill. 2d at 336, 211 N.E.2d at 259. Moreover, we recently noted our continued adherence to this abiding principle promulgated by Justice Walter Schaefer in *Darling*:

> " 'An individual becomes an expert by studying and absorbing a body of knowledge. To prevent cross-examination upon the relevant body of knowledge serves only to protect the ignorant or unscrupulous expert witness. In our opinion expert testimony will be a more effective tool in the attainment of justice if cross-examination is permitted as to the views of recognized authorities, expressed in treatises or periodicals written for professional colleagues.' " *Ruffin v. Boler*, 384 Ill. App. 3d 7, 25, 890 N.E.2d 1174, 1189 (2008), *appeal denied*, 229 Ill. 2d 695, 900 N.E.2d 1126 (2008), quoting *Darling*, 33 Ill. 2d at 336, 211 N.E.2d at 259.

Thus, we also recognize the competence of the author, as expressed in his or her written journal articles or texts, as well as the authoritativeness of medical texts and treatises. Through perhaps imprecise reference to the holding in *Darling*, the rule may have manifested a seeming dichotomy between establishing either an author's competence by judicial notice, or establishing the authoritativeness of a treatise or text by an expert witness.[1] In *People v. Johnson*, 206 Ill.

---

[1] We note as an aside that perhaps some confusion may arise among practitioners due to familiarity with Federal Rule of Evidence 803(18), the learned treatise exception to the hearsay rule. There, "[t]o the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published

1-09-0381

App. 3d 875, 564 N.E.2d 1310 (1990), this court stated:

"[C]ross-examination of an expert with reference to a recognized text or treatise is proper where either the court has taken judicial notice of the author's competence (see *Darling*, 33 Ill. 2d at 336, 211 N.E.2d at 259) or, absent concession by the witness, the cross-examiner proves the text or treatise is authoritative (see *Darling*, 33 Ill. 2d at 336, 211 N.E.2d at 259; *People v. Behnke* (1976), 41 Ill. App. 3d 276, 283, 353 N.E.2d 684, 689)." *Johnson*, 206 Ill. App. 3d at 879, 564 N.E.2d at 1313.

This recitation by no means changed the rule announced by our supreme court in *Darling*. In *Bowman*, we reiterated our belief that "cross-examination of an expert witness with material from 'a recognized text or treatise is proper where either the court has taken judicial notice of the author's competence [citation] or, absent concession by the witness, the cross-examiner proves the text or treatise is authoritative [citations].' " *Bowman*, 366 Ill. App. 3d at 587, 852 N.E.2d at 392, quoting *Johnson*, 206 Ill. App. 3d at 879, 564 N.E.2d at 1313. However, we also recited

---

treatises, periodicals, or pamphlets" may be admitted as substantive evidence as an exception to hearsay if such materials themselves are "established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice." Fed. R. Evid. 803(18). Further, such materials may then be admitted as substantive and read into evidence, though not submitted as exhibits. See Fed. R. Evid. 803(18). However, our jurisprudence interpreting Supreme Court Rule 213 since *Darling* allows that an author may also be acknowledged as authoritative in the field. Nonetheless, under our Rule 213 such materials are not admitted as substantive evidence as under the federal rule. See 210 Ill. 2d R. 213.

14

the original rule from *Darling*, that "[a]n author's competence can be established by a witness with expertise in the subject matter." *Bowman*, 366 Ill. App. 3d at 587, 852 N.E.2d at 392, citing *Darling*, 33 Ill. 2d at 336, 211 N.E.2d at 259.

Thus, *Darling's* broad reach confirms the understanding that an author's competence may be established either by judicial notice by the court or by an expert witness at trial. See *Darling*, 33 Ill. 2d at 336, 211 N.E.2d at 259. In other words, an expert witness at trial may establish the authoritativeness or reliability of an author in the relevant field; the rule is not restricted to only proving the authoritativeness of treatises, articles and texts. Here, Dr. Neerhof testified that he found Dr. Lerner to be a reliable authority. Accordingly, impeachment through the use of Lerner's views in his article was proper given that Neerhof recognized Lerner as a reliable authority in the field.

Under prevailing practice, medical texts themselves may also be recognized as authoritative. In *Ruffin*, 384 Ill. App. 3d at 26, 890 N.E.2d at 1190, under facts that essentially mirrored those in the case at bar, the plaintiff's medical malpractice action was founded upon an injury sustained upon delivery when the infant's shoulder became impacted with the mother's pelvic bone. In *Ruffin*, as here, the plaintiff's theory was that the doctor caused the infant's injury by using excessive lateral traction. In defense, the doctor argued that the injury was caused by the natural "propulsive forces" of labor. *Ruffin*, 384 Ill. App. 3d at 9, 890 N.E.2d at 1176 Although the jury returned a verdict for the doctor, the trial court ordered a new trial, based, in part, on its finding of error in allowing the use of certain undisclosed medical texts during cross-examination of plaintiff's expert, Dr. Stuart Edelberg, apparently the same expert who testified in the case *sub*

15

*judice*. On appeal, we found no error in allowing impeachment on cross-examination of Edelberg based on the medical texts given that he acknowledged the texts as authoritative. *Ruffin*, 384 Ill. App. 3d at 26, 890 N.E.2d at 1190. We likewise held that any error occasioned by the use of letters to a journal editor was rendered harmless when proper cross-examination was allowed using the medical texts and the jury was properly admonished. *Ruffin*, 384 Ill. App. 3d at 26, 890 N.E.2d at 1190.

It is, of course, axiomatic that treatises and textbooks may also be established as reliable authorities in and of themselves, as very often these are compendia or published not by an individual author or authors, but rather by an entity. For example, the PRECIS textbook used in the proceedings below is published by the ACOG. However, the practice of establishing such texts as authoritative in their own right must not be confused with the proper procedure of establishing the reliability of an expert author of a journal article in a field of expertise, through an expert witness at trial.

We find further instructive, *Downey v. Dunnington*, 384 Ill. App. 3d 350, 381-82, 895 N.E.2d 271, 296-97 (2008), where the Fourth District addressed the precise issue we are presented here. In *Downey*, the trial court refused to allow plaintiff's attorney to cross-examine an expert with an article because the plaintiff failed to prove that the specific article, as opposed to its author, was authoritative. The *Downey* court, relying on *Darling*, held that the trial court erred in refusing to allow the exhibit to be used during cross-examination of the expert. *Downey*, 384 Ill. App. 3d at 382, 895 N.E.2d at 297. However, in light of all the other learned publications that the plaintiff used to impeach the expert, the court found the error to be harmless. *Downey*, 384

16

Ill. App. 3d at 382, 895 N.E.2d at 297.

The *Downey* court also recognized this court's continued adherence to *Darling*:

"The First District takes the same view. It holds that a learned text is admissible for impeachment on cross-examination in any of the following three circumstances: (1) the trial court takes judicial notice of the author's competence, (2) the witness concedes the author's competence, or (3) the cross-examiner proves the author's competence by a witness with expertise in the subject matter. *Downey*, 384 Ill. App. 3d at 382, 895 N.E.2d at 297, citing *Bowman*, 366 Ill. App. 3d at 587, 852 N.E.2d at 392.

Although we note the dissent's reliance on *Iser v. Copley Memorial Hospital*, 288 Ill. App. 3d 408, 680 N.E.2d 747 (1997), we find such reliance misplaced as lacking any support for the dissent's contentions. In *Iser*, the plaintiffs attempted to elicit testimony concerning the authoritative nature of certain journal articles during direct examination of the plaintiff's expert in that case. *Iser*, 288 Ill. App. 3d at 409-10, 680 N.E.2d at 748. However, the plaintiff's expert had testified at his deposition that he was unaware of and did not review any articles for the case. The appellate court held that the plaintiff's expert witness could not give a new opinion that was contrary to his deposition testimony. *Iser*, 288 Ill. App. 3d at 412, 680 N.E.2d at 750. Conversely, the issue here is use of a treatise for impeachment on cross-examination, which does not implicate the requirements of Supreme Court Rule 213. Thus, citation to *Iser* on this point is not well-grounded and, therefore, we reject it.

The dissent also takes umbrage with the element of surprise allowed by such broad use of treatises on cross-examination, stating "[i]t is manifestly unfair to allow undisclosed articles to be

1-09-0381

freely used on cross-examination, especially when no witness has been properly identified as being willing to vouch for the reliability of the many opinions contained within the literature." 2. op. at 32. However, as noted, the salutary provisions of Supreme Court Rule 213 do not restrict or limit cross-examination of an opposing party's opinion witness, nor does the rule prohibit the use of undisclosed treatises in the conduct of such examinations. Further, Supreme Court Rule 213 specifically allows the eliciting of even new, previously undisclosed, opinions to be elicited on cross examination: "Without making disclosure under this rule, however, a cross-examining party can elicit information, *including opinions*, from the witness." (Emphasis added.) 210 Ill. 2d R. 213(g).

We find puzzling the dissent's observation that *Maffett*, a Fourth District case, is not binding upon this court. See slip. op. at 33. Although that observation may be accurate in the abstract, it has scant application here given that *Skubak*, a First District case, expressly adopted the holding and rationale of *Maffett*:

"[T]he position expressed in *Maffett* is also reflected in the supreme court's amendments to Rule 213 (effective July 1, 2002), preserving the freedom to cross-examine. The amended rule provides, '[w]ithout making disclosure under this rule *** a cross-examining party can elicit information, including opinions, from the witness.' 177 Ill. 2d R. 213(g)." *Skubak*, 339 Ill. App. 3d at 38, 790 N.E.2d at 74.

Moreover, in *Skubak*, we addressed and resolved the same concern of the dissent here and stated the following:

"Dispositive is the holding that Rule 213 does not apply to testimony elicited from an

18

opposing party's opinion witness. *Maffett*, 329 Ill. App. 3d at 577. In *Maffett*, the trial court properly allowed defendants to use previously undisclosed journal articles on cross-examination, finding 'none of Rule 213's disclosure requirements applies to cross-examining an opposing party's opinion witness.' *Maffett*, 329 Ill. App. 3d at 577. 'In this regard, we agree with what the appellate court wrote in *Southern Illinois Airport Authority v. Smith*, 267 Ill. App. 3d 201, 206, 641 N.E.2d 1240 *** (1994): "If the cross-examiner, to use a cliché, must telegraph his punch, cross-examination would lose its effectiveness. *** By eliminating the spontaneity, we would certainly avoid surprises. We may also be limiting the ability to ascertain the truth." ' *Maffett*, 329 Ill. App. 3d at 577." *Skubak*, 339 Ill. App. 3d at 37, 790 N.E.2d at 74.

Thus, contrary to the dissent's view that this district does not allow impeachment of experts through articles written by authors acknowledged to be authoritative, we have followed *Darling* since that case was decided. There has been no recent authority, either from our supreme court or in our own district or other appellate court districts, holding otherwise. Further, given the clear guidance shown by the 2002 amendment of Supreme Court Rule 213, we have no difficulty in concluding that allowing the use of the Lerner article on cross-examination was proper and did not constitute any error, much less reversible error. We discern no reason in this case to depart from our previous determination in *Skubak* to follow *Maffet*, nor do we discern any reason to depart from the clear guidance in the amendment of Supreme Court Rule 213.

We further find the dissent's argument is blunted by our appraisal that, even assuming any error occurred, the admission of testimony regarding the article did not result in any prejudice to

19

plaintiff. Although the dissent views the use of the Lerner article on cross-examination as extensive and highly damaging, our review of the record reveals that the Lerner article was but one of various articles and texts used to impeach plaintiff's expert. Notably, Dr. Edelberg was also questioned extensively about various other articles also espousing the view that brachial plexus injuries can occur spontaneously during delivery without any excessive traction by the physician. In particular, the 2005 PRECIS, published by the ACOG, specifically stated that evidence emerged over the years that in fact most brachial plexus palsies are not caused by physician traction and occur in vaginal deliveries.

Further, we find no prejudice inured to plaintiff from the trial court's limitation of cross-examination of Neerhof regarding the circumstances of litigation concerning the case examined in the Lerner article. Although defendant urges us to find forfeiture of this issue because plaintiff did not make an offer of proof of the evidence sought to be introduced (*Snelson*, 204 Ill. 2d 1, 787 N.E.2d 796), " '[i]t is not necessary that an offer of proof be made where the question shows the purpose and materiality of the evidence.' " *Carter v. Azaran*, 332 Ill. App. 3d 948, 956, 774 N.E.2d 400, 408 (2002), quoting *Creighton v. Elgin*, 387 Ill. 592, 606, 56 N.E.2d 825, 831 (1944).

We find the court properly exercised its discretion in granting in part and denying in part defendant's motion *in limine* to prevent cross-examination of Dr. Neerhof concerning the article to prevent a "trial within a trial." The trial court permitted inquiry as to whether Neerhof was aware that the co-author of the Lerner article was a defendant in a medical malpractice case, that Dr. Lerner was the retained expert in that case, and that the ethical procedures regarding the

article and its use in another trial are the subject of investigation. The trial court did not allow only one further question, "Are you aware that the record indications for shoulder dystocia were altered and deleted by the defendant physician?" in that case. Then the court sustained an objection to questioning concerning the investigation of that case based on foundation, hearsay, and relevance.

In our view, we find the trial court properly exercised its discretion concerning the alteration of records in the case study highlighted in the Lerner article. "Relevant evidence" is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Wojcik v. City of Chicago*, 299 Ill. App. 3d 964, 971, 702 N.E.2d 303, 309 (1998). Here, further questions concerning the specific factual details of alterations to the medical records in the case study would not have had any tendency to make the existence of any fact of consequence to the resolution of the case *sub judice* more or less probable. The trial court properly refused to allow further questioning concerning the alteration of records in that other case because "go[ing] into what the records in another trial showed" was "too far." However, the court ruled that plaintiff could ask whether Dr. Neerhof was aware there was an alteration of the medical records in that case and allowed ample cross-examination regarding this issue. Further, as defendant persuasively argues, it is highly unlikely the jury based its verdict solely on the Lerner article, or that the verdict would have been different had plaintiff been allowed to use the article to cross-examine defendant's expert. Thus, we find no prejudice resulted from the trial court's rulings regarding the Lerner article.

1-09-0381

Additionally, we find plaintiff's reliance on *Prairie v. Snow Valley Health Resources, Inc.*, 324 Ill. App. 3d 568, 755 N.E.2d 1021 (2001), is readily distinguishable. In *Prairie*, one of the trial errors requiring reversal was the admission of a medical treatise as substantive evidence. One of the plaintiff's experts testified at his discovery deposition that the treatise supported his opinion that certain drugs would prevent a patient from suffering atrial fibrillation. *Prairie*, 324 Ill. App. 3d at 580, 755 N.E.2d at 1032. However, at trial the expert admitted that he had erred and the treatise in question did not, in fact, support his opinion. *Prairie*, 324 Ill. App. 3d at 580, 755 N.E.2d at 1032. As such, the admission of the treatise as substantive evidence constituted error, and, though the trial court did not place as much weight on this error as upon other errors, the cumulative errors committed during that trial required reversal. *Prairie*, 324 Ill. App. 3d at 581, 755 N.E.2d at 1032.

Plaintiff next maintains the trial court erred in instructing the jury as to the proper standard of care. Defendant responds that the trial court properly instructed the jury, consistent with the evidence in the case. Whether to give or deny a jury instruction is within the trial court's discretion. *Bulger v. Chicago Transit Authority*, 345 Ill. App. 3d 103, 121, 801 N.E.2d 1127, 1142 (2003). " '[T]he test in determining the propriety of tendered instructions is whether the jury was fairly, fully, and comprehensively informed as to the relevant principles, considering the instructions in their entirety.' " *Mikus v. Norfolk & W. Ry. Co.*, 312 Ill. App. 3d 11, 25, 726 N.E.2d 95, 107 (2000), quoting *Leonardi v. Loyola University*, 168 Ill. 2d 83, 100, 658 N.E.2d 450, 458 (1995). In Illinois, " '[a] litigant has the right to have the jury clearly and fairly instructed upon each theory which [is] supported by the evidence.' " *LaFever v. Kemlite Co.*,

22

185 Ill. 2d 380, 406, 706 N.E.2d 441, 454 (1998), quoting *Leonardi*, 168 Ill. 2d at 100, 658 N.E.2d at 458. The question of whether the evidence at trial raised an issue, thus requiring a particular jury instruction, is within the sound discretion of the trial court. *Dixon*, 383 Ill. App. 3d at 466, 706 N.E.2d at 431, citing *LaFever*, 185 Ill. 2d at 406, 706 N.E.2d at 455. In general, we will reverse a trial court's ruling on a jury instruction only if the trial court committed a clear abuse of its discretion. *Stift v. Lizzadro*, 362 Ill. App. 3d 1019, 1025-26, 841 N.E.2d 126, 132 (2005), citing *Linn v. Damilano*, 303 Ill. App. 3d 600, 606-07, 708 N.E.2d 533, 538 (1999). A new trial should not be granted because of improper jury instructions unless a party's right to a fair trial has been seriously prejudiced. *Bulger*, 345 Ill. App. 3d at 121, 801 N.E.2d at 1142.

Plaintiff's citation to *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 901 N.E.2d 329 (2008), for the proposition that a party is entitled to have the jury instructed on his or her theory of the case is puzzling, considering that the jury here indeed was instructed on plaintiff's theory of the case, that excessive traction was applied to Keenan by Dr. Moore. Plaintiff essentially takes issue with the use of the word "excessive" traction, as opposed to using plaintiff's preferred verbiage, "greater than gentle" lateral traction. Yet, based on our review of the record, we find that the trial court gave the correct instruction based on the evidence, which established that the appropriate standard of care prevented "excessive traction." Both Edelberg and Neerhof predominately discussed "excessive" traction. Edelberg, plaintiff's own expert, testified that defendant violated the standard of care by using "excessive" traction. We find no error in the instruction given by the trial court.

We next address plaintiff's third claim, that the trial court erred in granting defendant's

23

motion *in limine*, barring any testimony as to whether an "arrest of labor" took place. Defendant counters that the trial court was within its discretion in barring such testimony, as there was no expert testimony to support such a theory. We agree with defendant. The trial judge has broad discretion to grant a motion *in limine* as part of her inherent power to admit or exclude evidence. *DiCosola v. Bowman*, 342 Ill. App. 3d 530, 535, 794 N.E.2d 875, 879 (2003). Plaintiff's theory was that if there was no "arrest of labor," then Keenan could not have been stuck on plaintiff's sacral promontory. However, here there was no disclosed expert opinion concerning an "arrest of labor" and no trial testimony as to this issue. Indeed, the only such testimony was during the deposition of the resident, Dr. Trevor Miller, when plaintiff's counsel used that phrase and asked Dr. Miller whether plaintiff had an "arrest of labor." As such, there simply was insufficient evidence in this case to support the admission of evidence as to this theory. As the court noted, it was "terminology that hasn't heretofore been disclosed." The trial court also found that it "sound[ed] like two entirely different medical problems and issues." The judge properly exercised her discretion in barring such testimony. Further, the court specifically allowed for revisiting the issue at trial, and also specifically ruled that if the issue came out there would be an opportunity for rebuttal. However, plaintiff failed to renew her argument opposing defendant's motion *in limine*, and therefore forfeited the issue and cannot sustain a showing of prejudice. See *Bergman v. Kelsey*, 375 Ill. App. 3d 612, 627, 873 N.E.2d 486, 502 (2007).

Fourth, plaintiff asserts that Meininger's trial testimony that his notation was an error violated Supreme Court Rule 213 because defendant's disclosures indicated that Meininger's testimony at trial would be consistent with the medical records. However, plaintiff has forfeited

24

1-09-0381

this argument, as plaintiff never objected to this testimony at trial. The failure to raise an objection at trial results in forfeiture of that issue. *Bergman*, 375 Ill. App. 3d at 629, 873 N.E.2d at 503.

Further, even assuming plaintiff had preserved the issue, the explanation of the inconsistency in Meininger's notes in the medical records was completely within the province of proper cross-examination. Circumstances may be developed on cross-examination that explain, qualify, discredit, or destroy the witness's direct testimony, even though that material may not have been raised on direct examination. *Leonardi*, 168 Ill. 2d at 105-06, 658 N.E.2d at 461. The scope of allowed cross-examination rests within the sound discretion of the trial court and will not be disturbed on appeal absent abuse of that discretion. *Leonardi*, 168 Ill. 2d at 102, 658 N.E.2d at 459. Further, plaintiff opened the door for such testimony with questioning on cross-examination. In *Bryant v. LaGrange Memorial Hospital*, 345 Ill. App. 3d 565, 577-78, 803 N.E.2d 76, 86-87 (2003), we held that the trial court properly allowed the defendants' expert witness to testify regarding opinions not previously disclosed, where the plaintiff "opened the door" to such testimony on redirect examination. Here, upon being prompted on cross-examination, Meininger simply explained the inconsistency in his notes, rather than offering a new "opinion." Meininger was not an expert witness in the case.

Lastly, plaintiff maintains that the trial court erred in denying her posttrial motion for a new trial or, alternatively, for judgment notwithstanding the verdict. We weigh the evidence and will set aside the verdict and order a new trial only if the verdict is contrary to the manifest weight of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454, 603 N.E.2d 508, 512 (1992). It is the

25

1-09-0381

province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide the weight to be given to the witnesses' testimony. *Maple*, 151 Ill. 2d at 452, 603 N.E.2d at 511-12. A verdict is against the manifest weight of the evidence where the opposite result is clearly evident or where the jury's findings are unreasonable, arbitrary, and not based on the evidence. *Maple*, 151 Ill. 2d at 454, 603 N.E.2d at 512-13; *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178-179, 854 N.E.2d 635, 652-53 (2006).

We review *de novo* a trial court's ruling on a motion for judgment notwithstanding the verdict. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132, 720 N.E.2d 242, 257 (1999). "[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967).

Here, the jury heard the testimony of two opposing experts, Dr. Edelberg and Dr. Neerhof, and the jury weighed their testimony and expert opinions and apparently chose to believe the testimony of Neerhof that nothing defendant did or did not do caused Keenan's injury, but rather the injury was caused by the forces of labor as he descended the birth canal. Further, there was ample medical literature, including the PRECIS text, supporting the assertion that brachial plexus injuries can, and very often do, occur without any physician traction as part of a normal vaginal delivery. Even Edelberg, plaintiff's expert, acknowledged that there is literature supporting the view that the natural maternal propulsive forces of labor may be partly or totally

26

responsible for posterior arm injuries, and that most brachial plexus injuries are not caused by the physician, though he disagreed with this view. Edelberg also acknowledged that the automatic assignment of responsibility for a brachial plexus injury to the physician is inappropriate. Further, Edelberg conceded that the medical records did not indicate excessive traction was used, and that none of the other residents or professionals present during the delivery testified that defendant applied excessive traction.

In opposition to plaintiff's theory, Dr. Neerhof explained the mechanism by which a brachial plexus injury can occur without excessive physician traction in that the baby's shoulder can get "hung up" on the mother's sacral promontory. Neerhof further explained that excessive downward traction could not have caused Keenan's injury, because his injury was to his posterior arm. Also, defendant had testified that it took her only 40 seconds to resolve the issue during the delivery, which was noted in the medical records. We find there was no evidence of excessive traction by defendant, other than Edelberg's unsupported opinion that this must have been the cause. Here, the manifest weight of the evidence supports the jury's verdict in favor of defendant and against plaintiff. See *Bowman v. University of Chicago Hospitals*, 366 Ill. App. 3d 577, 852 N.E.2d 383 (2006) (jury verdict against plaintiff affirmed where the evidence from the experts and physician witnesses was balanced but sufficiently favorable to defendants, in medical malpractice action based on the death of an infant allegedly due to failure to obtain cultures and administer antibiotics sooner).

## CONCLUSION

For the foregoing reasons, we affirm.

1-09-0381

Affirmed.

FITZGERALD SMITH concurs.

JUSTICE LAVIN, dissenting:

While I agree with the majority that the court properly instructed the jury and that the defense verdict below was not otherwise inherently contrary to the manifest weight of the evidence, I respectfully dissent on the rather significant issues of the whether the use of the medical article in the cross-examination of plaintiff's expert violated Supreme Court Rule 213 and whether defendant laid an adequate foundation for the use of the article.

The use of medical literature is commonplace in civil and criminal courts. By its very nature, medical literature is chockablock with opinions that are based upon numerous tests, studies and statistics. The question of how to properly utilize such literature has occasionally vexed our courts and has led to maintenance of two different rules regarding its use at trial. On direct examination, an expert is not permitted to refer to the findings of any literature or treatises, even if he would testify that his opinions are based, in part, on the literature in question. People v. Anderson, 113 Ill. 2d 1, 12 (1986); Schuchman v. Stackable, 198 Ill. App. 3d 209, 230 (1990); Mielke v. Condell Memorial Hospital, 124 Ill. App. 3d 42, 54 (1984). This rule is based upon the theory that it would be unfair to allow this sort of testimony where the author of the article is not subject to cross-examination. See Schuchman, 198 Ill. App. 3d at 230. Though given an opportunity, our supreme court has declined to specifically approve the use of medical literature

28

1-09-0381

on direct examination. Anderson, 113 Ill. 2d at 9-10.

On the other hand, cross-examination of an expert utilizing reliable and authoritative literature has clearly been embraced in Illinois, despite the fact that the author is still not subject to cross-examination himself. Bowman v. University of Chicago Hospitals, 366 Ill. App. 3d 577, 587 (2006). This dichotomy often leads to the awkward practice of a party establishing the reliability of an article through his own expert, in order to cross-examine the opposing party's expert with the article. It also sets up a conundrum in which medical literature cannot be effectively utilized to support an expert's theory on direct examination but can be used as a sword to undermine an opposing expert's testimony.

In order to utilize a medical article or treatise in cross-examination of any witness, a party must first lay an appropriate foundation for the article in question. Bowman, 366 Ill. App. 3d at 587. Generally speaking, a witness with sufficient knowledge must testify that the article is "authoritative" on an issue that is relevant before the jury. Expert witnesses, however, have long been loathe to admit that an article or text is authoritative for fear that their credibility might be undermined by the contents of the writing. Fortunately, this court has recognized that there is no particular magic to the term authoritative, permitting a foundation to be laid with terms like "standard," "well respected," "a good source" or "a very good book." Bowman, 366 Ill. App. 3d at 587.

The majority chides plaintiff for a supposed failure to make a proper foundation objection, but it is abundantly clear from the record that plaintiff's counsel not only stated that the "foundation" was deficient, but he also exactingly delineated the reasons that defendant would be

29

unable to lay a proper foundation because the article itself was unreliable for multiple reasons. The majority seems to argue that since plaintiff's counsel did not utter the statement, "this article is not reliable (or authoritative)," that this issue is forfeited. As noted above, this sort of hypertechnical jurisprudence has been discredited in this rather limited area of the law, to say the least. See <u>Bowman</u>, 366 Ill. App. 3d at 587. If plaintiff's counsel had merely used the word "foundation" without explaining the nature of the inadequate foundation, I might be persuaded to join my colleagues in their articulate and thorough analysis of the muddled mess that is Illinois case law on the use of medical literature at trial. But this simply was not the case in the trial of this matter. Even if counsel failed to supply the magic word ("unreliable" or "nonauthoritative") that the majority would seemingly require, he clearly supplied the trial court with ample reasons that defendant would never be able to lay a foundation that this particular article was either reliable or authoritative.

Plaintiff's counsel, in his objection to the use of the article in cross-examination of Dr. Edelberg, stated:

> "[T]his article was recently rejected. The author of this article, and what they did was, this was in conjunction with a medical malpractice defendant and his expert witness and when ACOG found out about that, they actually launched an investigation into that physician based on his failure to disclose. He was doing this investigation on behalf of a litigation defendant as opposed to medical research. We have fundamental issues with the *validity of the article on its face* that we've got substantial problems with." (Emphasis added.)

30

1-09-0381

The court then overruled plaintiff's Rule 213 objection and asked about the "other objection." Plaintiff's counsel repeated that there was a problem with the foundation, going directly to the issue of the unreliability of the article:

> "The foundation for itself – the publisher actually launched an investigation as to this article itself because of the underlying information. It wasn't disclosed as part of the publication that the author in their study – there was a relationship between the med-mal defendant and him being his expert witness, *brought into question his credibility* in writing the article and ACOG has actually gone and launched an investigation into that physician's credentials for actually doing this." (Emphasis added.)

Defense counsel then argued that this objection had nothing to do with the "foundation of the substance of this," but plaintiff's counsel retorted, "It has everything to do with the foundation because ACOG themselves says, 'Wait a minute, this is way out of line. Having had any knowledge of these shenanigans we would never have even allowed this to go on. In addition to that we're now going and doing our own investigation into what actually happened because of this.' "

Despite this rather detailed assault on the article's lack of reliability because of the ethical issues raised, the majority blithely states that plaintiff failed to "expressly object based on the article's lack of authoritativeness." Slip. op. at 11. Nothing could be further from the reality of what happened in the trial court. Plaintiff's counsel objected on the basis of Rule 213 and objected that there was an inadequate foundation because the article itself was unreliable. That is the only fair reading of the objection made at trial.

31

1-09-0381

In the case *sub judice*, defendant did not disclose the name of any witness who would testify that the article was, in fact, authoritative. The method that defendant utilized was to cross-examine plaintiff's expert with the article, despite the fact that plaintiff's expert specifically did not believe that the article was reliable because the co-authors failed to disclose, *inter alia*, that the article was based on litigation in which one testified as an expert for the other. In order to provide the necessary foundation, defense counsel chose to use her expert, but that witness, Dr. Neerhof, did not testify that the article itself was reliable or authoritative. He merely testified that one of its authors was a reliable authority in the field. This foundation might barely pass muster in some circumstances, but it is completely inadequate here because of the article's numerous credibility and reliability problems that were brought to the trial court's attention. Just saying that a doctor is reliable does not mean that everything he writes is reliable. This article in this case is exquisite proof of the truth of that statement.

In my view, the trial court's ruling was reversible error because defendant was allowed to repeatedly utilize the article in cross-examination without a sentence of testimony stating that the article itself was reliable. The argument that the use of the article was merely impeaching as opposed to substantive evidence lacks merit when one reads the rather effective drilling of the expert with the article's potent words on the most important issues in this medical malpractice trial. Sanctioning this practice could empower a party to marshal stacks of articles for use in cross-examination of her opponent's expert, without disclosing a single witness who would vouch for the reliability or authoritativeness of any article. One can easily imagine a scenario where numerous articles are handed over just before trial, without any direction as to which might

32

actually be utilized during cross-examination, not to mention who might supply the necessary foundation for the authoritativeness of the article. Forcing one's opponent to absorb this level of technical information while waiting to see which specific article is utilized and which expert might vouch for its reliability might strike some as clever strategy, but it is inconsistent with the purpose of discovery and is a straightforward recipe for incurable prejudice.

Maffett v. Bliss, 329 Ill. App. 3d 562 (2002), relied upon by defendant and cited favorably by the majority, might seem to validate some of this methodology, namely the lack of a discrete requirement in Rule 213 to identify medical articles that might be used in cross-examination, but it does not stand for the proposition that there is no requirement to identify a witness to establish the *bona fides* of a medical article. A statement that an article from a medical journal is reliable is quintessentially an opinion, after all, and undisclosed opinions regarding medical literature should not be heard by the trier of fact. Iser v. Copley Memorial Hospital, 288 Ill. App. 3d 408, 410-11 (1997). Furthermore, Maffett is a Fourth District case which is not binding upon this court. See O'Casek v. Children's Home & Aid Society of Illinois, 229 Ill. 2d 421, 440 (2008). Further, the majority's reliance on Skubak v. Lutheran General Health Care Systems, 339 Ill. App. 3d 30 (2003), which cited Maffett, does not, in my judgment, validate Maffett's holding.

Supreme Court Rule 213 is designed not only to prevent surprise, but to provide the litigants with a ready guide to the evidentiary issues that will be dealt with by the expert witnesses who testify. See Spaetzel v. Dillon, 393 Ill. App. 3d 806, 812 (2009) (purpose of discovery rules, including Rule 213, is to discourage surprise and strategic gamesmanship). Allowing a party to

utilize undisclosed medical articles that may or may not be authenticated by unidentified witnesses is contrary to the letter and the spirit of the rule and it should be condemned by the court. It is manifestly unfair to allow undisclosed articles to be freely used on cross-examination, especially when no witness has been properly identified as being willing to vouch for the reliability of the many opinions contained within the literature.

Turning again to the facts of the matter *sub judice*, it is abundantly clear that plaintiff's expert was wholly unsupportive of the findings of the article by Drs. Lerner and Salamon. It is also uncontradicted that this article was not specifically identified in any pretrial disclosure or deposition. Plaintiff made a timely objection, pursuant to Rule 213, and the court considered it at sidebar. During this conference, plaintiff's counsel revealed that the article also suffered from an infirmity as a result of the fact that one of the authors had testified for the co-author in a malpractice case that served as the medical and factual foundation for the article. This fact was not mentioned when the article was published.

The record is quite clear that defense counsel quoted this article frequently during cross-examination. In sum, the article stood for the proposition that Erb's palsy could occur in the absence of noted shoulder dystocia and without any traction being applied. This, of course, was exactly contrary to the medical theory espoused by plaintiff's obstetrical expert. These issues raised by plaintiff's counsel went directly to the issue of the article's reliability and should have given the trial court pause when considering whether to allow its use, especially because it would inevitably create a collateral and potentially confusing battle with none of the article's authors appearing in court before the jury. The trial court did allow plaintiff's counsel some latitude in

1-09-0381

examining Dr. Neerhof, but that witness conveniently claimed a lack of knowledge on some of the critical shortcomings of the article, leaving the effectiveness of the examination very much in doubt.

The majority suggests that plaintiff's arguments about this article are much ado about nothing, because defendants also utilized several other articles in cross-examination of plaintiff's expert. This strikes me as a rather cynical suggestion, authorizing a party to slip in patently unreliable literature before the jury as long as one softens the blow with some reliable texts and articles. It is not hyperbole to suggest that the Lerner and Salamon article went to the very heart of the claim of malpractice in this case. It directly suggested that Erb's palsy could occur in the complete absence of any known shoulder dystocia, merely as a result of the normal propulsive forces of labor. It also merits mention that the article in question is a case report and not a peer-reviewed article. A fair reading of the work product of this defendant/expert tag team suggests that the missive was penned more to assist litigants than to inform medical professionals, and this view was borne out by the testimony in the matter *sub judice*. More to the point, if defendant already had three other reliable sources at hand, the use of the facially unreliable article not only highlights the cumulative nature of the proof, but also its inherent prejudicial effect.

The final proof of prejudice can be found in defense counsel's closing argument in which the findings of the article are tied directly to defendant's sole proximate cause defense. The Lerner and Salamon article is self-described as noteworthy because it "appears to be the first unambiguous case report of a baby born vaginally without the occurrence of shoulder dystocia, that resulted in a permanent brachial plexus injury." Thus, the article was used in cross-

35

examination of plaintiff's expert to support the argument that the normal forces of labor and delivery can cause a brachial plexus injury and then masterfully reemphasized in the defendant's closing argument on sole proximate cause:

> "This instruction goes to the heart of this case, the heart of Bridge No. 2. We have demonstrated to you that the sole, the sole, the only cause, the sole proximate cause of Keenan's injury was the expulsive forces of labor was his shoulder getting stuck on the sacral promontory while the forces of labor kept pushing him down the birth canal or as Dr. Neerhof suggested to you yesterday, malpositioning. *** If you believe that those other causes, the forces of labor, the malpositioning in utero were the cause of Keenan's injury, then your verdict must be in favor of Dr. Moore."

As the cited argument conclusively establishes, defendant not only used this dubious medical article to discredit plaintiff's expert, it was also utilized substantively to provide medical literature support for her sole proximate cause defense. It would be hard to develop a set of facts in which the improper use of medical literature could be more effectively tied to the very "heart" of a defense to a malpractice claim.

There is no question that the trial court was in a difficult position when dealing, in real time, with this undisclosed medical literature. The trial court surely felt it was on solid footing because the article did seem to impeach plaintiff's experts on his theory of how the injury occurred and it was "only" going to be used on cross-examination. It is clear that the court endeavored to be fair to both sides on this particular evidentiary issue, even stating on the record, "I am trying to limit the damage on either side. But most importantly, I don't want the jury to

hear a trial within a trial." Unfortunately, in my view, the trial court was unsuccessful in both of these laudable goals. First, the plaintiff was clearly damaged by the use of this article, and second, this jury did hear a trial within a trial, but it never heard the full scope of the misleading nature of the Lerner and Salamon article.

The failure to disclose a witness who would supply the necessary foundation when coupled with the obvious problems inherent in the article itself, resulted in the type of prejudice that prevented plaintiff from getting a fair trial because the jury was allowed to consider very persuasive evidence on the very central issues of negligence and sole proximate cause from an undisclosed source and in a facially unreliable form. Allowing plaintiff to highlight some of the article's infirmities did not adequately cure the prejudice, in my view. I would reverse the judgment and remand the case for a new trial on all issues and further rule that the Lerner and Salamon article not be used at trial.