2015 IL App (1st) 141788
No. 1-14-1788 and 1-14-2706 (cons.)

SECOND DIVISION
Modified upon denial of rehearing
February 2, 2016

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| TED FRAGOGIANNIS, as Special Administrator of the Estate of Georgia Tagalos, deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 08 L 5238 |
| SISTERS OF ST. FRANCIS HEALTH SERVICES, INC. and DR. PERRY MARSHALL, D.O., | ) ) ) ) ) | Honorable Lorna Propes |
| Defendants-Appellants. | ) | Judge Presiding |

JUSTICE SIMON delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Hyman concur in the judgment and opinion.

**OPINION**

¶ 1    This is a medical malpractice and wrongful death case.   The appeal is taken following a jury verdict in plaintiff's favor.   The hospital appeals arguing that the judgment against it should be reversed outright because it cannot be liable, and the doctor appeals arguing that he is entitled to a new trial.   We affirm.

¶ 2                                          BACKGROUND

¶ 3    On July 9, 2006, plaintiff Ted Fragogiannis, accompanied by his mother, Georgia Tagalos,

went to visit a friend in Bourbonnais, Illinois. Tagalos was a long-time sufferer of asthma. During the car ride home, Fragogiannis noticed that his mother began wheezing and gasping for air. She used two different inhalers, but her condition failed to improve and she was in respiratory distress. Fragogiannis called 911 and arranged for an ambulance to meet them on the highway and take his mother to the hospital. According to the paramedics' protocol, Tagalos was taken to Saint James Hospital, the nearest hospital.

¶ 4    Tagalos arrived at the hospital at 1:45 p.m. and at that point she could no longer speak, but she was still responsive. Jennifer Mullen, a nurse, met the ambulance upon its arrival and began the process of emergency care. Defendant, Dr. Perry Marshall, was the emergency room's attending physician that day. He was summoned by the nurse to address what had become a respiratory emergency. Dr. Marshall was at Tagalos's bedside within minutes, but the parties disagree about how many minutes elapsed. Dr. Marshall instructed Dr. Julie Mills, a fourth year emergency resident, to see Tagalos and indicated that Tagalos might need to be intubated. Dr. Mills assessed the patient and determined that an emergency intubation was required. At 1:56 p.m., eleven minutes after arriving at the hospital and while Dr. Mills was preparing for intubation, Tagalos became unresponsive.

¶ 5    When Dr. Mills attempted to intubate Tagalos, the patient vomited. Upon seeing how much vomit there was, which would prevent the necessary visual to complete the intubation, Dr. Marshall called for an anesthesiologist, an expert in establishing airways, to assist. The vomit was suctioned away and, five minutes after the first attempt, a second intubation attempt was made. At some point around this time, Dr. Marshall also summoned surgery in case they needed to surgically create an airway. The vomiting continued and the second intubation attempt was

unsuccessful. It was now 2:01 p.m. At that point, Dr. Marshall made an attempt to intubate Tagalos and, between the anesthesiologist and another attending physician, three or four more intubation attempts were made. All of them failed. Dr. Marshall ordered a cricothyrotomy—a surgical incision in the trachea to create an airway. Sometime between 2:07 and 2:10 p.m., the cricothyrotomy was performed, establishing an airway. Nonetheless, Tagalos suffered cerebral hypoxia, a complete deprivation of oxygen to the brain. Tagalos was effectively brain dead and she was taken off life support and died three days later.

¶ 6    Tagalos's son, as the special administrator of her estate, filed this case for medical malpractice and wrongful death. Tagalos's position is that Dr. Marshall and the hospital were negligent because they took approximately 25 minutes before establishing an airway despite the fact that the patient arrived with a respiratory emergency. The hospital and Dr. Marshall's respective positions were that they complied with the standard of care.

¶ 7    At trial, Plaintiff's expert, Dr. Richard Sobel testified that defendants deviated from the standard of care in numerous ways. Dr. Sobel testified that the doctors waited too long to initially attempt intubation and that, when they did attempt to intubate Tagalos, they failed to administer sedation or properly oxygenate her prior to the attempts. Sobel testified that Dr. Marshall should have concluded after the first failed attempt that Tagalos had a failed airway and ordered a cricothyrotomy at that time. Overall, he concluded that the failure to establish an airway while 26 minutes of respiratory failure persisted constituted a deviation from the standard of care leading to Tagalos's death. Sobel also testified that the nurse was negligent because she failed to properly alert Dr. Marshall to the exigency of the situation. Sobel claimed that the delay to get a doctor involved and administer prompt care was *a* cause, if not the cause, of Tagalos's death.

¶ 8    Dr. Sobel's testimony was challenged by the testimony of Dr. Marshall and his expert, Dr. Timothy Rittenberry, and by the hospital's expert Dr. James Walter.   These doctors testified that Marshall and the hospital complied with the standard of care.   These witnesses maintained that a complete inability to intubate is rare and that Dr. Marshall acted properly by repeatedly trying to intubate because performing a cricothyrotomy before those attempts were made would have been inconsistent with common practice.   They concluded, based on the fact that there was little improvement in oxygenation even after the cricothyrotomy was performed, that the problem was not the lack of an airway.   But most important to this appeal is the way in which these doctors were examined by plaintiff's counsel.

¶ 9    Each of the doctors was questioned relatively extensively about the *Manual of Emergency Airway Management*, a treatise about managing airways in emergency respiratory situations.   The treatise advances a particular "failed airway algorithm" that proposes what action should be taken when particular symptoms are present.   Plaintiff's counsel questioned the defense witnesses by reading them sections of the book and asking the witnesses whether they agreed with the contents. Plaintiff's counsel also questioned the defense witnesses about their failure to bring and present contrary authoritative literature on the subject.   The parties dispute the propriety of that questioning.

¶ 10    Plaintiff's theories at trial were that he could recover against Dr. Marshall individually for his individual negligent acts, and that he could recover against the hospital because the nurse was negligent or because the doctor was an apparent agent of the hospital.   After a seven day trial, the jury returned a general verdict in plaintiff's favor and against the hospital and Dr. Marshall for $4.7 million.   These appeals are taken from that final judgment, but include considerations arising

No. 14-1788 & 14-2706 (cons.)

from motions *in limine* and posttrial motions.

¶ 11    On appeal, the hospital argues here as it did in the trial court that it cannot be liable for the nurse's conduct because there was undisputed evidence that she summoned Dr. Marshall right away so she did not breach any duty.   The hospital also argues that it cannot be liable because there was no evidence that anything Mullen did or did not do proximately caused Tagalos's death. The hospital further argues here as it did in the trial court that it cannot be liable for Dr. Marshall's conduct because he was an independent contractor and not its apparent agent.   Dr. Marshall argues in a separate appeal that he is entitled to a new trial because of improper questioning and argument by plaintiff's counsel, including violations of granted motions *in limine*.

¶ 12                                    ANALYSIS

¶ 13                         *Issues for St. James Hospital Only*

¶ 14    Beginning with the hospital, it argues that it was entitled to a directed verdict on liability insofar as it concerns the conduct of Jennifer Mullen, the nurse, because there was no evidence on Mullen breaching the standard of care nor was there evidence that anything Mullen did or did not do caused Tagalos's death.   Plaintiff disagrees and points to the testimony of its expert who concluded that Mullen failed to immediately call a doctor to the patient despite the existence of the respiratory emergency.   Plaintiff also contends that Mullen's delay in getting the doctor to the patient's bed was at least a significant factor leading to Tagalos's death.

¶ 15    The trial court may enter a directed verdict when all of the evidence, viewed in the light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary ruling based on the evidence could ever stand.   *Stehlik v. Village of Orland Park*, 2012 IL App (1st) 091278, ¶ 34.   A directed verdict is improper where there is any evidence, together with

reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome. *Susnis ex rel. Susnis v. Radfar*, 317 Ill. App. 3d 817, 826 (2000). We review the grant or denial of a motion for a directed verdict *de novo*. *Jones v. DHR Cambridge Homes, Inc.*, 381 Ill. App. 3d 18, 28 (2008).

¶ 16    To demonstrate that there is no evidence to support the plaintiff's allegations of negligence against Mullen, the hospital points primarily to Mullen's testimony. In various iterations, Mullen testified that she called for help right away and that she got help right away. This testimony was supported by Dr. Marshall's testimony as he acknowledged that he was notified immediately when Tagalos arrived and that he had been in the room for three minutes with Tagalos by the time he ordered a blood gas test at 1:50 p.m.

¶ 17    The hospital charts, prepared by Mullen, state: "MD to bedside" with the notation of 1:52 p.m., which would have been seven minutes after Tagalos arrived at the hospital. Plaintiff seized upon this note in an attempt to substantiate its position that Mullen was negligent. But even if the doctor did not arrive at the bedside for seven minutes, that does not mean that Mullen failed to properly and urgently *alert* the doctor of the emergency. Although plaintiff's expert testified that there may be some concern about the proper way to call out emergency codes and how that unfolded in this case, his ultimate conclusion was that the actual manner in which the alert was made was not dispositive as long as the emergency nature of the situation was conveyed. The only duty that plaintiff claimed Mullen owed but breached was that she needed to alert the doctor of the immediate need to provide care to Tagalos. All of the evidence says she did.

¶ 18    Moreover, plaintiff did not, and could never have, proved that whatever delay possibly

attributable to Mullen would have affected the care Tagalos received. There was not even evidence that beginning the intubation process earlier would have prevented death, and intubation was not even attempted by the doctors immediately, they attempted ventilation first. Plaintiff could not prove that any delay attributable to Mullen (and there was no evidence that there was any) would have resulted in an earlier intubation attempt, a successful intubation attempt, or an earlier cricothyrotomy. Accordingly, the hospital cannot be liable on the basis of any act or omission by the nurse.

¶ 19 The other theory of liability plaintiff pursued against the hospital was that it could be liable for the negligence of Dr. Marshall on an apparent agency theory. Dr. Marshall was an independent contractor of the hospital at the time care was rendered to Tagalos.

¶ 20 For a hospital to be liable under the doctrine of apparent authority, a plaintiff must show: (1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 525 (1993). The element of justifiable reliance is satisfied if plaintiff relies upon the hospital to provide complete emergency room care, rather than upon a specific physician. *Golden v. Kishwaukee Community Health Services Center, Inc.*, 269 Ill. App. 3d 37, 45 (1994). In medical malpractice actions against a physician and the hospital, whether the emergency room physician was an apparent agent of the hospital, such that hospital could he held vicariously liable for physician's negligence, is a question for the jury. *Id*. at 524.

¶ 21    Here, the plaintiff was seeking emergency care from the *hospital* itself.    Plaintiff did not choose to be treated specifically by Dr. Marshall, the doctor was simply the attending physician in the emergency room that day.    Neither party chose the other.    Instead, it was the hospital that chose Dr. Marshall to treat Tagalos.    Plaintiff did not even live in the area and was simply taken to defendant-hospital as a result of its proximity to the location where her respiratory emergency occurred.    The hospital holds itself out as a provider of general emergency care.    Tagalos had no way to know nor to choose who would render her care, she was in respiratory distress and could not speak; nor did she have time, all persons involved recognized that her need for care was extremely urgent.    Tagalos could not have known that the people rendering care to her were not employees.    In the end, it was the province of the jury to resolve this question of fact, which it properly did in plaintiff's favor.

¶ 22    The hospital attempted to rely on a consent form that was signed by Tagalos's son that the hospital uses to inform patients that its emergency room physicians are independent contractors. The existence of an independent contractor disclaimer in a consent form is an important factor to consider in deciding whether a hospital held a physician out as its agent, but it is not necessarily dispositive.    *James by James v. Ingalls Memorial Hospital*, 299 Ill. App. 3d 627, 633 (1998). The form has no bearing on this case.    Tagalos did not sign the form and never knew of its existence.    In fact, Tagalos was already brain dead, hypoxic, by the time her son signed the document.    By the time the form was signed, the negligent acts had already occurred.    In any event, there was no evidence offered as to how Fragogiannis could have legally bound his mother by his signature.    The after-the-fact "consent" is, as a matter of law, insufficient to abrogate a vicarious link between the hospital and the attending physician.    *See, e.g.*, S. Allan Adelman,

No. 14-1788 & 14-2706 (cons.)

*Fundamentals of Health Law*, at (B)(2), American Health Lawyers Association Seminar, Chicago, IL (November 10, 2004) (collecting cases explaining that disclaimers of employee status that are given at the last minute or without meaningful time will not allow a hospital to avoid the application of apparent authority). Suffice it to say that a third party signing a consent form after the negligence has occurred and after the patient is brain dead would not inform any unsuspecting patient that the four doctors that treated the individual were independent contractors.

¶ 23    The hospital also complains about the jury instruction that was given on the subject of apparent authority, arguing that the trial court should have used language from *Gilbert* about the hospital having to hold itself out as a provider of a particular type of care to create apparent authority. The trial court instead gave the relevant model instruction supposedly prevailing at the time. We do note that, although not addressed by the parties, the Illinois Pattern Jury Instruction on professional negligence at least now includes the "holding out" language from *Gilbert*. See Ill. Pattern Jury Instr. Civ. 105.10. But we do not find that the hospital is entitled to any relief on this basis. There is no chance that a different outcome would have resulted if the instruction proffered by the hospital was given. In fact, if the trial court had given the instruction suggested by the hospital and the jury found in its favor on the question of apparent agency, we would reverse that finding. Plaintiff proved that the hospital held itself out as a provider of complete emergency room care and that Tagalos neither knew nor could she have known that Dr. Marshall was not an employee of the hospital. No one chose Dr. Marshall but relied upon the hospital to provide complete emergency room care. That is all that is required, in *haec verba*. The indisputable evidence on the subject conclusively establishes an apparent agency relationship, as a matter of law—under *Gilbert* or any other arguably applicable standard.

¶ 24                                   *Medical Negligence*

¶ 25     Even though we have determined the hospital can be held liable for the acts of Dr. Marshall, its liability is still predicated on a finding that Dr. Marshall was negligent.   No one challenges the sufficiency of the evidence.   Instead, both the hospital and Dr. Marshall himself offer argument to support their position that the finding of liability against Dr. Marshall should be vacated for things that occurred during the trial.   Both of their appeals follow two main lines of attack on the proceedings which defendants claim entitle them to a new trial.   One line of attack is that the court erred by allowing plaintiff's counsel to use medical literature as what they characterize to be substantive evidence.   The other is that it was improper for plaintiff's counsel to suggest on multiple occasions that defendants were required to produce some sort of medical literature to support their defenses.

¶ 26     We begin with the alleged use of medical literature as substantive evidence.   Prior to trial, defendants filed a motion *in limine* seeking to bar plaintiff from introducing medical literature as substantive evidence.   The trial court granted the motion.   However, defendants claim that plaintiff's counsel effectively circumvented that ruling by reading passages from the book to defense witnesses under the guise of impeachment.

¶ 27     In Illinois, medical literature cannot be used as substantive evidence, but can be used for purposes of impeachment.   *Downey v. Dunnington*, 384 Ill. App. 3d 350, 382 (2008).   The admission of evidence and the scope of cross-examination of expert witnesses rests within the sound discretion of the trial court, whose rulings will not be disturbed absent an abuse of that discretion.   *Iaccino v. Anderson*, 406 Ill. App. 3d 397, 408 (2010).   A learned text can be used for impeachment on cross-examination in any of the following three circumstances:   (1) the trial

No. 14-1788 & 14-2706 (cons.)

court takes judicial notice of the author's competence; (2) the witness concedes the author's competence; or (3) the cross-examiner proves the author's competence by a witness with expertise in the subject matter. *Stapleton ex rel. Clark v. Moore*, 403 Ill. App. 3d 147, 160 (2010).

¶ 28 Defendants do not strenuously object to the authoritativeness of the *Manual of Emergency Airway Management* or the competence of its authors, Dr. Ron Walls and Dr. Michael Murphy. On direct examination, plaintiff's expert, Dr. Sobel, testified about the *Manual*, not for the truth of the matters asserted therein, but to explain that he considered the *Manual* in arriving at his opinions. Dr. Sobel further testified that the authors were recognized authorities in the field of emergency medicine and that the *Manual* is "highly regarded" and the "most comprehensive source there is" dealing with emergency airway management. That alone might be sufficient to satisfy the third prong of the test for the authoritativeness of a text as set forth above. But in addition to that, defendants' witnesses recognized the book as a competent source, though they obviously disagreed that the methods set forth in book were uniform. There is no requirement that adverse witnesses clearly concede that the test is "authoritative." Instead, recognition that a text is "standard," "well-respected," "a very good book," a "standard book," and "a good source" are indications that the text is authoritative. See *Bowman v. University of Chicago Hospitals*, 366 Ill. App. 3d 577, 587 (2006). The *Manual* is also used as a textbook which the *Stapleton* court noted was, although not determinative, an additional indication of authoritativeness in and of itself. *Stapleton*, 403 Ill. App. 3d at 159. The *Manual* was properly considered authoritative in this case.

¶ 29 Moving to defendants' principal objection, how the book was used, we have to determine whether it was improper for plaintiff's counsel to read from the book and ask the witnesses

questions about its contents. First of all, it is important to note that any reading from the book was done on cross-examination. Defendants' witnesses offered their expert opinions and their reasons for reaching them under direct examination. Plaintiff then used the authoritative text to confront those witnesses with opposing authority in an attempt to discredit their conclusions and to test their expertise. Defendants never objected to the testimony as improper impeachment. Additionally, there is no blanket prohibition on an attorney reading the text of an authoritative treatise on cross-examination. For example, and although not expressly adopted in Illinois, under the Federal Rules of Evidence it is the *statements* from a learned treatise that are not excluded under the hearsay rule. Fed. R. Evid. 803(18). Those statements may then be called to the attention of a witness on cross-examination. *Id*. The Rule continues, "[i]f admitted, the statement may be read into evidence but not received as an exhibit." *Id*.; see also *Allen v. Safeco Ins. Co. of Am.*, 782 F.2d 1517, 1520-21 (11th Cir. 1986) (stating that once a foundation was laid, counsel was permitted to read a statement from an authoritative article on cross-examination); *Lawrence v. Nutter*, 203 F.2d 540, 542 (4th Cir. 1953) (explaining that, to test an expert's competence, it is proper on cross-examination to read excerpts of an authoritative text and ask the expert whether he agrees or disagrees). Even materials such as videotapes that effectively dictate an authoritative view that is counter to the one espoused by an expert witness have been found to be properly used on cross-examination. See, *e.g.*, *Costantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164, 170-71 (2d Cir. 2000).

¶ 30     In one similar, but significantly distinguishable Illinois case, we held that a plaintiff's counsel should not have been allowed to impeach medical witnesses by reading text from certain treatises and asking whether the witnesses agreed with what was read. *Brown v. Arco Petroleum*

No. 14-1788 & 14-2706 (cons.)

*Products Co.*, 195 Ill. App. 3d 563, 570-71 (1989). But, the reason we found that to be improper was because the materials that were read from were never identified, no witnesses were questioned about the author's competence, and no witnesses were called to establish that the materials were authoritative. *Id*. That is not the case here where the authoritativeness of the book was made apparent and a different view of the proper course of action was presented to make the jury question defendants' experts' opinions.

¶ 31    Moreover, when cross-examined by the content of the treatise, each of the doctors took the opportunity to explain why the book was not discrediting of their testimony. Dr. Marshall and the experts repeatedly made the jury aware of the weaknesses in the book and the witnesses were able to explain that the book did not really discredit their opinions because medical emergency situations must be handled in light of innumerable factors. For example, in one particular line of questioning, plaintiff's counsel basically read from the *Manual* to express the author's view, which was counter to defendants' view, that when there is a failed airway and intubation cannot be achieved, a cricothyrotomy should be done immediately. Referring to the authors, Dr. Marshall responded, "[t]hey're not discussing this case." Dr. Rittenberry similarly testified that the algorithm set forth in the *Manual* could only be viewed as a general guideline because conditions vary so greatly between patients and the conditions they present and doctors need to make numerous judgment calls in respiratory emergency situations. Dr. Walter testified that the book was not impeaching because it relied on experiments done only on dead people. Defendants' counsel had the opportunity to, and did, rehabilitate their witnesses in light of them being confronted by the treatise. The witnesses each had an opportunity to reiterate their opinions in the face of the contrary view brought about by the *Manual*.

¶ 32 Defendants and their experts, were or should have been well aware that plaintiff intended to use the opinions in the book as impeachment because plaintiff made clear he would do so in response to a motion *in limine*. Defendants had in their possession Dr. Sobel's opinion statements and had deposed him. Even if it were valid to object to plaintiff presenting the material because defendants' witnesses had not read it (it is not, *Iaccino*, 406 Ill. App. 3d at 408), defendants and their experts had the opportunity before trial to become familiar with the book and either explain why it was not authoritative or explain why the opinions offered therein were wrong or inapplicable. Defendants' witnesses had every opportunity to explain why the book did not discredit their expert opinions in the case and to reiterate why their positions correctly reflected the standard of care and that it was complied with. Even if defendants could have somehow shown that the trial court committed error, a party is not entitled to reversal based on an erroneous evidentiary ruling unless the error substantially prejudiced the aggrieved party and affected the outcome of the case, and the party seeking reversal bears the burden of establishing prejudice. *Shachter v. City of Chicago*, 2011 IL App (1st) 103582, ¶ 80.

¶ 33 Another objection that somewhat tracks the authoritativeness issue is whether the algorithm described in the book can be suitably classified as "generally accepted" to meet Illinois' standard for admissibility of expert methodology when the book itself acknowledges that the algorithm cannot be "scientifically proven." The *Manual*'s authors acknowledge that the algorithm "cannot be considered to be scientifically proven as the only or even necessarily the best way to approach any one clinical problem or patient." The authors continue, "[r]ather, [the algorithms] are designed to help guide a consistent approach to both common and uncommon airway management situations." But the algorithm was never offered for its truth or as

No. 14-1788 & 14-2706 (cons.)

substantive evidence of the standard of care.   There was evidence adduced at trial that the *Manual* is a highly regarded, comprehensive authority on emergency airway management.   To be used for impeachment purposes, all that is required is that the treatise be established as a reliable authority. *Stapleton*, 403 Ill. App. 3d at 160.   Any shortcomings of the treatise, such as the fact that its content cannot be scientifically proven, should be brought out by the opposing party to demonstrate to the jury that the content should be afforded little weight, but that does not mean the material cannot be used for impeachment.

¶ 34     Defendants also argue that the judgment should be vacated due to plaintiff's suggestion that defendant's expert, Dr. Walter, should have presented a treatise or some other medical literature to support his opinions.   However, the trial court sustained the defense's objection to this question and instructed the jury to "disregard any suggestion that the doctor had an obligation to bring literature to court."   During rebuttal, plaintiff's counsel returned to this idea by stating, "at least we brought a book."   Again the objection was sustained.   This argument was not ideal, but it was only brought up in rebuttal in response to defendants' criticism of the book and plaintiff's failure to bring in the author to testify in the case.     We will not reverse a judgment due to improper comments by counsel unless a party has been substantially prejudiced by such comments. *Graham v. Nothwestern Memorial Hospital*, 2012 IL App (1st) 102609, ¶ 34.   Here, even if some of the questions or comments made by plaintiff's counsel were improper, defendant has not demonstrated such requisite prejudice.

¶ 35                              *Hospital's Petition for Rehearing*

¶ 36     In its petition for rehearing, the hospital contends that it was denied a fair trial because the trial court denied its attempt to submit a special interrogatory to the jury and to test whether its

liability was based on nursing care or on an apparent agency theory. The hospital contends that since the jury returned a general verdict and it was not allowed to ascertain the basis on which the verdict was rendered, the jury could have found the hospital to be liable based on the conduct of Nurse Mullen, even though we have held that there was no evidentiary basis for doing so. But that would be entirely harmless.

¶ 37    Regardless of the trial court's ruling on the motion for directed verdict, the case was going to the jury on the same evidence with both the hospital and Dr. Marshall potentially liable. On the verdict form, signed by all 12 jurors, the jury found for plaintiff against *both* the hospital and Dr. Marshall. If the jury intended to hold only the hospital liable (and only based on Mullen's conduct), then it would have returned a verdict against only the hospital. If the jury intended to hold only Dr. Marshall liable, as an independent contractor, then it would have returned a verdict against only the doctor. Even if the jury could have somehow held the extremely perverse view that the hospital was liable because of only Mullen *and* Dr. Marshall was liable, but only as an independent contractor, the hospital's argument would still fail. As we already explained, the uncontradicted evidence at trial established an apparent agency relationship—it was established as a matter of law. In fact, we even explained that if the jury did not find an apparent agency relationship on the evidence presented we would reverse for failing to do so. *Supra* ¶ 23. The hospital was not denied a fair trial.

¶ 38                                  CONCLUSION

¶ 39    In sum, like all trials, there were certain imperfections and objectionable practices, but nothing that rose to the level that would warrant reversal. In response to many of defendants' arguments, plaintiff points out that defendants did not object or did not object on the proper basis at

No. 14-1788 & 14-2706 (cons.)

trial.   We nonetheless chose to address defendants' arguments on the merits.   The errors complained of by defendants concern the way their witnesses were cross-examined and a comment made by plaintiff's counsel during rebuttal to the closing arguments, but defendant has not persuaded us that any of the blemishes on the proceedings impugn the integrity of the jury verdict. Defendants have not shown that any of the alleged errors substantially prejudiced it or affected the outcome.   When the record is viewed as a whole, it is apparent that the verdict should stand and, because we find no reason to disturb the jury's verdict, we affirm.

¶ 40    Affirmed.